Filed 4/10/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| POET, LLC et al., | F073340 |
| Plaintiffs and Appellants, | (Super. Ct. No. 09CECG04659) |
| v. | |
| STATE AIR RESOURCES BOARD et al., | **OPINION** |
| Defendants and Respondents; | |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | |
| Intervener and Respondent. | |

APPEAL from an order the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Wanger Jones Helsley, Timothy Jones, John P. Kinsey, and Dylan J. Crosby for Plaintiffs and Appellants.

Xavier Becerra, Kamala D. Harris, Attorney General, Robert W. Bryne, Assistant Attorney General, Gavin G. McCabe, Supervising Deputy Attorney General, M. Elaine Meckenstock, Melinda Piling and Myung J. Park, Deputy Attorneys General, for Defendants and Respondents.

Natural Resources Defense Council and David Pettit for Intervener and Respondent.

-ooOoo-

The California Global Warming Solutions Act of 2006 (Health & Saf. Code, § 38500 et seq.) established the first comprehensive greenhouse gas regulatory program in the United States. Its goal is to progressively reduce greenhouse gas emissions to 1990 levels by 2020. The State Air Resources Board (ARB) was charged with achieving this goal. One of its actions was promulgating the low carbon fuel standards (LCFS) regulations that are the subject of this litigation.

When ARB adopted the original LCFS regulations in 2009, it violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.[1]). In 2013, we identified those violations and directed the issuance of a writ of mandate compelling ARB to take corrective action. (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681 (*Poet I*).) Now, we consider whether ARB's actions satisfied that writ and corrected one of its CEQA violations. The specific question presented is whether ARB's disclosures about the *project's* effects on biodiesel consumption, and the related increases in nitrogen oxide (NOx) emissions, satisfied paragraph 3 of the writ of mandate.

The writ provisions were drafted by this court. Therefore, we interpret paragraph 3 of the writ without deference to the trial court or ARB. We used the term "project" in paragraph 3 of the writ in the same way it is used in CEQA, the Guidelines[2] and CEQA case law. Stated generally, "project" includes the whole of an activity directly undertaken by a public agency. More specifically, when the agency's activity involves a regulation (as compared to building a physical structure, such as a road or power plant), the whole of the activity constituting the "project" includes the enactment,

---

[1] All unlabeled statutory references are to the Public Resources Code.

[2] "Guidelines" refers to the regulations promulgated to implement CEQA, which are set forth in California Code of Regulations, title 14, section 15000 et seq. (§ 21083, subds. (a), (f) ["Office of Planning and Research shall prepare and develop proposed guidelines" and "Secretary of the Resources Agency shall certify and adopt guidelines"].)

2.

implementation and enforcement of the regulation. Here, the "project" includes the whole of ARB's activity in promulgating and enforcing (1) the regulations originally adopted in 2009 and (2) the replacement regulations adopted in 2015 in response to the writ of mandate issued pursuant to *Poet I*.

Consequently, ARB's view that the "project" included only the regulations adopted in 2015 was wrong and explains why it incorrectly chose 2014 NOx emissions as the baseline. The proper baseline for a project normally is the conditions existing when the environmental review of the project is commenced. Here, ARB's review commenced before the regulations were first approved in 2009. Thus, ARB's use of 2014 NOx emissions as the baseline was improper and generated flawed results when that baseline was plugged into the formula for calculating environmental change. Specifically, NOx emissions in 2014 were higher than the NOx emissions prior to the 2009 approval of the LCFS regulations, which caused ARB's most recent calculations of the yearly changes in NOx emissions to be too low and thus misleading. ARB's flawed analysis of NOx emissions did not cure the CEQA violation identified in *Poet I* or comply with paragraph 3 of the writ.

Leaving the technical language of CEQA aside, the purpose of the writ was to provide the public and decisions makers with information omitted from the original environmental disclosure documents in 2009. Thus, one way to evaluate ARB's attempt at compliance is to ask whether the revised environmental disclosure documents provided all of the information that would have been provided if the original documents had complied with CEQA. The answer is "no," ARB's revised documents did not provide that information. In contrast to ARB's revised documents, CEQA-compliant original documents would not have used a 2014 baseline and would have shown that NOx emissions in 2015 and later were larger than the baseline, not smaller. Accordingly, we conclude the writ should not have been discharged and the CEQA violation continues uncorrected.

The second major issue in this appeal is how to remedy ARB's failure to comply with CEQA and the writ. Pursuant to our discretionary authority to fashion appellate relief, we reverse the order discharging the writ and remand for further proceedings under a modified writ. The modifications direct ARB to address NOx emissions from biodiesel in a manner that complies with CEQA, including the use of a proper baseline. As to the fate of the current version of the LCFS regulations, only the provisions addressing diesel fuel and its substitutes[3] were affected by the flawed analysis of NOx emissions. Thus, the remainder of the LCFS regulations will be allowed to remain in effect. The provisions addressing diesel fuel and its substitutes appear, on balance, to provide environmental benefits that outweigh the potential adverse impacts and, therefore, we will not invalidate those provisions. Instead, the standards for diesel fuel and its substitutes in effect for 2017 shall remain the operative standards until the modified writ is discharged.

We therefore reverse the order discharging the writ and remand for further proceedings.

## FACTS AND PROCEEDINGS

*Overview of LCFS Regulations*

The goal of the LCFS regulations is to progressively reduce the greenhouse gas emissions from transportation fuels used in California. (Cal. Code Regs., tit. 17, § 95480.) The LCFS regulations use carbon intensity values to approximate the greenhouse gas emissions generated from all stages of producing, transporting and consuming a fuel—that is, the fuel's complete lifecycle. (Cal. Code Regs., tit. 17, § 95484 [average carbon intensity requirements].) Regulated parties must meet average

---

**3** The two main substitutes for conventional diesel are biodiesel and renewable diesel. Biodiesel and renewable diesel have different chemical structures and are made by different chemical processes. When used, renewable diesel emits less particulate matter and NOx than conventional diesel. (*Poet I*, *supra*, 218 Cal.App.4th at p. 732, fn. 37.) In contrast, biodiesel emits more NOx than renewable diesel or conventional diesel.

4.

carbon intensity requirements for the gasoline and diesel fuel they handle each calendar year. (*Id*., subd. (a).) Carbon intensity is stated as grams of carbon dioxide equivalent per megajoule. For example, the 2017 average carbon intensity requirement for diesel fuel and its substitutes is 98.44 grams of carbon dioxide equivalent per megajoule. (*Id*., subd. (c).) In contrast, the carbon intensity value assigned to conventional diesel, based on average crude oil and average refinery efficiencies, is 102.01 grams of carbon dioxide equivalent per megajoule. (Cal. Code Regs., tit. 17, § 95488, subd. (c) [lookup table].) Thus, a regulated party handling only conventional diesel fuel would not meet the carbon intensity requirement for 2017. That regulated party would need to handle diesel fuel and substitutes assigned a lower carbon intensity. For instance, some biodiesels are assigned carbon intensity values of 37.54 (animal fat feedstock) or 56.95 (plant oil feedstock).

Most providers of petroleum and biofuels in California are subject to the reporting and carbon intensity value requirements of the LCFS regulations. (Cal. Code Regs., tit. 17, §§ 95485 [demonstrating compliance], 95491 [reporting and recordkeeping].) Regulated parties file annual reports to show they have complied. The reports (1) calculate the average carbon intensity of the fuels handled by the regulated party and (2) determine the credits or deficits generated by comparing that average to the carbon intensity value set as the standard for that year. (Cal. Code Regs., tit. 17, § 95486 [generating and calculating credits and deficits].) If credits are generated, they can be deposited into an account maintained by ARB and, once banked, the credits may be (1) retained indefinitely, (2) retired to offset deficits and meet future compliance requirements, or (3) sold to other regulated parties. (*Id*., subd. (a)(1).) Transactions in carbon intensity credits are subject to public disclosure and other requirements. (Cal. Code Regs., tit. 17, § 95487.) ARB maintains a website reporting the monthly price and transaction volume of LCFS credits.

*First Appeal*

The history of the original LCFS regulations,[4] from the enactment of the authorizing legislation in 2006 through April 2010, is described in the "FACTS" section of *Poet I*, *supra*, 218 Cal.App.4th at pages 699 through 707 and need not be repeated here. The original LCFS regulations became effective in 2010 and were set forth in sections 95480 through 95490 of title 17 of the California Code of Regulations.

In December 2009, plaintiffs POET, LLC and James M. Lyons filed this litigation to challenge the LCFS regulations, alleging violations of CEQA and California's Administrative Procedure Act (APA; Gov. Code, § 11340 et seq.). In November 2011, the trial court denied plaintiffs' petition for writ of mandate and filed a judgment in favor of ARB. Plaintiffs appealed.

In May 2013, oral argument was held in the appeal. In June 2013, this court issued an order requesting input from counsel regarding the terms of the disposition and attached a tentative disposition. We asked counsel to make certain assumptions, including that certain CEQA violations had occurred and the LCFS regulations would be allowed to continue to operate. We stated our preference for a disposition "drafted so the superior court can take the language from the disposition and insert it into the peremptory writ of mandate" and asked counsel to take this into account when proposing changes or alternatives to the tentative disposition. Our order sought input on six topics of interest, including (1) maintaining the status quo and whether the 2014 standards should have

---

[4] For purposes of this opinion, the term "original LCFS regulations" refers to the regulations adopted by ARB in 2009, which the Office of Administrative Law stated became effective on January 12, 2010, *and* the minor amendments adopted by ARB in 2010, which the Office of Administrative Law stated became effective on April 15, 2010. (*Poet I*, *supra*, 218 Cal.App.4th at pp. 706-707.)

In contrast, we use the term "2015 LCFS regulations" to mean the LCFS regulations adopted by ARB in 2015, which went into effect on January 1, 2016. ARB refers to the 2015 LCFS regulations as the "new LCFS regulations," while plaintiffs describe them as the "Readopted LCFS Regulation."

6.

been allowed to go into effect and (2) the framework for ARB's analysis of NOx emissions on remand.

On July 15, 2013, our opinion in *Poet I* was filed. We reversed the denial of plaintiffs' petition for writ of mandate and remanded for the issuance of a writ directing ARB to correct its CEQA and APA violations. In August 2013, we denied ARB's petition for rehearing. The next month, ARB filed a petition for review in the California Supreme Court. On November 27, 2013, our high court denied ARB's petition for review and, later that day, this court issued a remittitur.

In December 2013, plaintiffs submitted a proposed peremptory writ to the trial court. On January 6, 2014, the trial court signed and filed the proposal. On February 10, 2014, the trial court responded to ARB's objections by filing a modified version of the peremptory writ of mandate (February 2014 writ),[5] which is the operative writ for purposes of this appeal.

As directed by the disposition in *Poet I*, the February 2014 writ compelled ARB to take action to correct its violations of CEQA. The writ provision at the center of this appeal is described in part I.C, *post*. We also took the unusual step of allowing the original LCFS regulations to remain in effect despite the CEQA violations. (See *Poet I*, *supra*, 218 Cal.App.4th at pp. 763, 767.) At the time, we estimated that, on balance, leaving the LCFS regulations in place would provide more protection for the environment than suspending their operation pending ARB's compliance with CEQA. (*Id*. at p. 762.) We stated that "the emissions of greenhouse gases will be less if the LCFS regulations are allowed to remain in effect, rather than being suspended. The possibility that the use of biodiesel will produce more NOx emissions than the petroleum-based diesel that it

---

[5] The modifications affected only paragraph 5 of the writ and are not relevant to this appeal.

replaces does not justify throwing out the entire LCFS regulation." (*Id*. at pp. 762-763.)[6] Consequently, we decided to preserve the status quo pending ARB's compliance with the writ by directing ARB to continue to adhere to the LCFS regulations standards in effect for 2013 until its corrective action was completed. (*Id*. at p. 767.)

*Corrective Action Relating to NOx Emissions*

The portion of the February 2014 writ relevant to this appeal concerns the deficiencies in ARB's analysis of NOx emissions and mitigation measures for any significant adverse environmental impact resulting from increased NOx emissions. ARB's actions to comply with the writ and remedy its CEQA violations are described in part I.D, *post*.

*ARB's Return, Discharge Order, Stay Requests and Appeal*

In November 2015, ARB filed its return to the February 2014 writ. (See pt. I.D.4, *post*.) In January 2016, the trial court issued an order discharging the writ. (See pt. I.D.5, *post*.) On February 5, 2016, plaintiffs filed a motion to stay the order discharging the writ pending an appeal. On February 29, 2016, the trial court's order denying the motion for a stay was served on the parties without holding a hearing.

On March 4, 2016, plaintiffs filed a notice of appeal from the order discharging the writ and the order denying their motion for stay pending appeal. Plaintiffs then filed a petition for writ of supersedeas requesting a stay of the order discharging the writ pending a decision in this appeal. We denied the writ and request for a stay, even though plaintiffs established a strong probability of prevailing in this appeal because their

---

**6** Our concern about the overall impact of suspending the LCFS regulations can be described as the-baby-with-the-bathwater problem. In other words, we were concerned that suspending the LCFS regulations might result in a loss of the baby (i.e., the reduction of various greenhouse gases) to resolve the problem of dirty bathwater (i.e., an improper CEQA analysis of NOx emissions).

showing relating to the balance of harms, which encompasses the-baby-with-the-bathwater problem, was insufficient.

## DISCUSSION

I.      COMPLIANCE WITH THE WRIT OF MANDATE

     A.      <u>Standard of Review</u>

          *1.      Parties' Contentions*

Plaintiffs contend that, under the applicable standard of review, the issue presented is whether ARB prejudicially abused its discretion in its attempt to demonstrate compliance with the February 2014 writ. Plaintiffs refer to the abuse of discretion standard set forth in section 21168.5, which requires the agency to support its findings with substantial evidence and to proceed in the manner required by law.

ARB contends the only issue on appeal is whether the superior court erred in discharging the writ. (*Los Angles Internat. Charter High School v. Los Angeles Unified School Dist.* (2012) 209 Cal.App.4th 1348, 1355 ["issue is whether the trial court erred in ruling that the respondent … complied with the writ"].) To resolve this issue, ARB urges us to focus on its response to the writ and the superior court's assessment of that response. ARB contends the discharge order can be reversed only if ARB's action pursuant to the writ was so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law. (*Id*. at pp. 1355-1356.)

The parties' slightly different descriptions of the standard of review does not present an authentic controversy because, at bottom, both regard the fundamental issue as whether ARB's action complied with the writ and contend that action is reviewed for an abuse of discretion. We agree that the abuse of discretion standard applies to ARB's actions because ARB's attempt to comply with the writ is, for all practical purposes, an attempt to comply with CEQA. (§ 21168.5.)

9.

### 2. *General Principles Regarding Abuse of Discretion Standard*

Our conclusion that the abuse of discretion standard of review applies does not complete the description of the principles applied to evaluate ARB's actions. "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of [the agency's action] under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) If findings of fact (whether express, implied or both) are challenged for lack of evidentiary support, the appellate court determines whether the findings are supported by substantial evidence. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427 (*Vineyard*).) In contrast, if ARB's resolution of a question of law is challenged, the appellate court subjects that question of law to an independent (i.e., de novo) review on appeal. (*Id*. at p. 427.) For example, the proper construction of CEQA presents a question of law subject to independent review on appeal. (*Poet I*, *supra*, 218 Cal.App.4th at p. 748.)

### 3. *Interpreting the February 2014 Writ*

The parties' dispute over ARB's compliance with the February 2014 writ is primarily a conflict about how to interpret the writ's provisions. We drafted the language in the writ that is the subject of the present dispute and, more fundamentally, we identified the CEQA violations the language was designed to remedy. Thus, we are in the best position to determine its meaning and explain its purpose. (Cf. *Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 494 ["we are in as good a position as, and perhaps in a better position than, the trial court to decide" an issue that turns on the import of our earlier published opinion].) Accordingly, we conclude the interpretation of the writ should be treated as a question of law subject to our independent review and ARB's interpretation should be given no deference. In short, the abuse of discretion standard of review does not allow ARB to misconstrue the directions given by this court in *Poet I*.

10.

B.     The CEQA Violation Relating to NOx Emissions

The California Global Warming Solutions Act of 2006 charged ARB with regulating the sources of emissions of greenhouse gases.  To reduce greenhouse gas emissions from the fuel used for transportation, ARB adopted a number of regulations, including the LCFS regulations.  Diesel fuel was one of the transportation fuels addressed by the original LCFS regulations.  ARB thought it could reduce the greenhouse gas emissions of diesel fuel by promoting the use of biodiesel, either as a substitute for, or blended with, petroleum-based diesel fuel.  (*Poet I*, *supra*, 218 Cal.App.4th at p. 731.)  Consequently, the original LCFS regulations attempted to encourage the production and use of biodiesel.

The environmental disclosure document[7] generated by ARB in connection with proposing and adopting the original LCFS regulations violated CEQA by impermissibly deferring (1) the analysis of potential increases in the emission of NOx resulting from increased biodiesel use and (2) the analysis and formulation of mitigation measures for any significant increases in emissions.  (*Poet I*, *supra*, 218 Cal.App.4th at pp. 698-699, 731-741.)  These delays were not, standing alone, violations of CEQA.  However, when the original LCFS regulations went into effect *before* the deferred analysis was completed, CEQA was violated.  Without an analysis of NOx emissions and a determination of whether the emissions created a significant environmental effect (by

---

[7]     Most of the environmental disclosures and discussion were included in the draft Environmental Analysis attached to the Initial Statement of Reasons (ISOR) published on March 5, 2009.  The ISOR and draft Environmental Analysis are comparable to a draft environmental impact report (EIR).  (See *Poet I*, *supra*, 218 Cal.App.4th at pp. 701, 710.)  Similarly, the December 2009 Final Statement of Reasons and the final Environmental Analysis are comparable to a final EIR.  (*Id*. at p. 733.)

itself or cumulatively),[8] the implementation of the original LCFS regulations created the possibility that unmitigated adverse environmental consequences were occurring.

ARB's 2009 draft environmental disclosure document did not ignore the question of "whether the substitution of biodiesel for petroleum-based diesel would increase emissions of NOx." (*Poet I*, *supra*, 218 Cal.App.4th at p. 704.) Instead, ARB sidestepped and never reached the question of whether any increase would constitute a "'significant effect on the environment.'" (§ 21083, subd. (b).) "ARB's staff *assumed* that there would be no increase in the NOx emissions based on the position that, after conducting a test program for biodiesel, ARB would institute regulations setting fuel specifications for biodiesel that would ensure NOx emissions did not increase." (*Poet I, supra,* at pp. 704-705, italics added.)

The public response to ARB's release of the draft environmental disclosure document included comments challenging the assumption that promoting the use of biodiesel would not increase NOx emissions. (*Poet I*, *supra*, 218 Cal.App.4th at p. 705.) "In response to these comments, ARB reiterated its position that it would 'ensure that biodiesel fuel use does not increase NOx emissions significantly by promulgating a new motor vehicle fuel specification for biodiesel.'" (*Ibid*.)

ARB's assurance was an empty promise. The LCFS regulations were put into effect without any specifications for biodiesel sold in California. In April 2009, the Board[9] attempted to have the specifications ready in time by passing a resolution

---

**8**     Unless the context requires otherwise, subsequent references in this opinion to the significance of an effect on the environment include significance based on the three conditions listed in section 21083, subdivision (b). Thus, the references to whether an increase in NOx emissions is significant includes whether the incremental increase attributable to the project is "cumulatively considerable" for purposes of section 21083, subdivision (b)(2). (See Guidelines, §§ 15130 [discussion of cumulative impacts], 15355 [definition of cumulative impacts].)

**9**     For purposes of this opinion, "Board" refers to the group of individuals acting in that group's capacity as the governing entity of ARB. Under this narrow definition,

directing motor vehicle fuel specifications be proposed by December 2009. (*Poet I, supra*, 218 Cal.App.4th at pp. 705, 733 [Resolution 09-31].) As the complexities of creating specifications that reduced biodiesel's emissions unfolded and it became clear that deadline could not be met, ARB stated that the adoption of fuel specifications for biodiesel was "'now tentatively scheduled for 2010.'" (*Id*. at p. 734.) This revised schedule was not met. A biodiesel emissions study was conducted and the report from that study was not issued until October 2011. (*Ibid*.) By June 2013 (shortly before our decision in *Poet I*), no regulation containing fuel specifications for biodiesel had been adopted. (*Ibid*.) Consequently, at that time, the LCFS regulations had been in effect since January 2010 (1) without the completion of the CEQA-required analysis of whether increased biodiesel use would increase NOx emissions and (2) without any fuel specification regulations to mitigate increases in NOx emissions that otherwise might occur from increased use of biodiesel.

## C. The Disposition from *Poet I*

Our decision in *Poet I* dealt with the foregoing CEQA violation involving NOx emissions from biodiesel and with other CEQA violations. It (1) reversed the judgment denying plaintiffs' writ petition; (2) remanded the matter for further proceedings; (3) directed to trial court to grant plaintiffs' petition and issue a writ of mandate; and (4) specified terms to be included in the writ of mandate. (*Poet I*, *supra*, 218 Cal.App.4th at p. 766.) The terms in the writ required ARB to set aside its *approval* of the LCFS regulations.[10] (*Ibid*.) In addition, ARB was required to select a single decision maker to complete the project's environmental review before reapproving the LCFS regulations or

---

Board is not synonymous with ARB, a public agency. (See *Poet I*, *supra*, 218 Cal.App.4th at p. 705, fn. 12.)

[10] Setting aside an approval is different from setting aside (i.e., suspending or invalidating) the regulations.

13.

approving a modified version of the regulations.  (*Id*. at pp. 765, 767.)  The third

numbered paragraph in the disposition compelled ARB to:

> "Address whether the project will have a significant adverse effect on the
> environment as a result of increased NOx emissions, make findings
> (supported by substantial evidence) regarding the potential adverse
> environmental effect of increased NOx emissions, and adopt mitigation
> measures in the event the environmental effects are found to be
> significant."  (*Id*. at p. 767.)

This language was tracked in paragraph 3 of the trial court's February 2014 writ

(paragraph 3), which stated:

> "ARB shall address whether the project will have a significant adverse
> effect on the environment as a result of increased NOx emissions, make
> findings (supported by substantial evidence) regarding the potential adverse
> environmental effect of increased NOx emissions, and adopt mitigation
> measures in the event the environmental effects are found to be
> significant."

Whether ARB complied with the paragraph 3 and what appellate relief is

appropriate if ARB did not comply are the two main issues in the appeal.

      D.     ARB's Actions to Comply with Writ

          1.     *ARB's Modified Regulations*

ARB's attempts to comply with the February 2014 writ (which included preparing

a revised analysis of NOx emissions from biodiesel) preceded its approval of a modified

version of the LCFS regulations, rather than a reapproval of the original version without

changes.  The possibility of modification was recognized in *Poet I*, where we stated that

ARB might exercise its discretion on remand by "reapproving the LCFS regulations or a

modified version of those regulations."  (*Poet I*, *supra*, 218 Cal.App.4th at p. 765.)

Before our decision in *Poet I* was filed, ARB was holding public workshops to discuss

regulatory changes and amendments to the LCFS regulations.

From 2013 through September 2015, ARB's staff held five overarching

workshops to discuss the LCFS regulations as a whole and 16 topic-specific workshops

14.

to discuss proposed revisions. On December 30, 2014, an initial statement of reasons was released to the public in support of ARB's staff's proposal to readopt the LCFS regulations. Attached as an appendix was a draft Environmental Analysis of (1) the proposed LCFS regulations and (2) newly proposed regulations addressing alternative diesel fuels (ADF).[11] After a 45-day comment period and a public hearing in February 2015, the Board directed modifications be made to the proposed regulations. After another comment period, the Board held a public hearing on September 24, 2015, and continued its consideration of the proposed LCFS and ADF regulations until the next day.

On September 25, 2015, the Board adopted resolutions that finalized its rulemaking determinations. The Board certified the final Environmental Analysis for the proposed LCFS regulations and ADF regulations, stating it met the requirements of CEQA. Based on the final Environmental Analysis (which is described in the next section of this opinion), the Board adopted (1) a set of findings and statement of overriding considerations and (2) the modified version of the LCFS regulations referred to in this opinion as the "2015 LCFS regulations." (See fn. 4, *ante*.) The findings addressed NOx emissions by stating: "The E[nvironmental Analysis] found that while use of biodiesel can increase NOx emissions in some engines, depending in part on feedstock and blend level, total NOx emissions from biodiesel will decline from the 2014 baseline level under the proposed LCFS and ADF. Therefore, the Board finds that the use of biodiesel consistent with the proposed ADF will not result in a significant adverse impact to air quality."

The 2015 LCFS regulations took effect on January 1, 2016. They are set forth in sections 95480 through 95497 of title 17 of the California Code of Regulations.

---

**11**     The ADF regulations are set forth in sections 2293 through 2293.9 of title 13 of the California Code of Regulations and their purpose is "to establish a comprehensive, multi-stage process governing the commercialization of alternative diesel fuels (ADF) in California." (Cal. Code of Regs., tit. 13, § 2293; see pt. II.F.3, *post*.)

## 2.    *Final Environmental Analysis*

ARB's final Environmental Analysis stated that "adoption of the proposed LCFS and ADF regulations would be anticipated to result in changes from the 2014 baseline emissions level for several criteria air pollutants (e.g., emissions from the additional use of biodiesel and renewable diesel fuels)."[12] The final Environmental Analysis also stated:

> "Biodiesel and renewable diesel fuels have been found to reduce [particulate matter] emissions relative to conventional diesel.  Renewable diesel has been found to decrease NOx relative to conventional diesel; however, biodiesel has been found to increase NOx emissions in some cases, depending on feedstock and type of engine [] used."

The final Environmental Analysis described the 2014 baseline conditions by stating approximately 65 million gallons of biodiesel and 114 million gallons of renewable diesel were consumed in California in 2014.[13]  Next, it compared emissions from the combination of these diesel fuels with emissions from conventional diesel fuel to produce an estimate of what the emissions would have been if only conventional diesel fuel had been used.  This comparison led ARB to conclude the use of the foregoing volumes of biodiesel and renewable diesel (taking into account the use of new technology diesel engines) increased NOx emissions of about 1.2 tons per day and decreased particulate matter (PM) about 0.8 tons per day.  These figures do not describe the changes

---

[12]    Federal regulations define a "[c]riteria pollutant" as "a pollutant for which the Administrator [of the Environmental Protection Agency] has promulgated a national ambient air quality standard pursuant to 42 U.S.C. 7409 (i.e., ozone, lead, sulfur dioxide, particulate matter, carbon monoxide, nitrogen dioxide)."  (40 C.F.R. § 52.31(b)(4).)  Nitrogen dioxide is one form of NOx.

[13]    "In 2008, approximately 4.2 billion gallons of diesel fuel were consumed in California, while the state's total commercial biodiesel production capacity was approximately 35 million gallons per year."  (*Poet I*, *supra*, 218 Cal.App.4th at pp. 731-732.)  The final Environmental Analysis updated the information about production capacity by stating: "In 2013, nine biodiesel producers had an annual capacity of 61 million gallons."  Thus, in a span of five years, biodiesel production capacity increased about 75 percent.

in emissions of NOx and PM caused by the version of the LCFS regulations in effect in 2014, because the final Environmental Analysis did not take the additional analytical step of separating the increases in biodiesel and renewable diesel usage *caused by the LCFS regulations* from the increases in usage *caused by other factors*, such as the incentives created by federal regulations for fuel standards and federal tax incentives. In other words, the emission comparison made was between (1) an estimate of the emissions of all diesel fuel and its substitutes used in 2014 and (2) a hypothetical emissions profile that would have been generated if conventional diesel had replaced all of the biodiesel and renewable diesel fuel used in 2014.

The final Environmental Analysis's reference to biodiesel's "feedstock" as a factor affecting NOx emissions might encompass both the source of the organic matter (e.g., soybean, cottonseed, tallow, restaurant grease) used to produce the biodiesel and the rate at which the biodiesel is blended with conventional diesel. (See *Poet I*, *supra*, 218 Cal.App.4th at pp. 732-733.) A blend of 5 percent biodiesel and 95 percent conventional diesel fuel (B5) is the most common blend level in California. Blends of 20 percent or less of biodiesel (B20) generally can be used without engine modifications. Biodiesel, by itself, usually is considered a blendstock rather than a fuel blend, although it can be used in some engines built after 1994, provided certain engine parts such a gaskets and hoses are made from biodiesel-compatible materials.

The final Environmental Analysis stated that if the proposed ADF and LCFS regulations were adopted in 2015, ARB's staff predicted future decreases in total NOx emissions from biodiesel and renewable diesel. Table 4-1 in the final Environmental Analysis set forth the projected changes in statewide NOx emissions for each year from 2014 through 2022. These projected changes were attributed to the total use of biodiesel and renewable diesel, *not the incremental increase in use of these fuels caused by the ADF and LCFS regulations*. Using 2014 as a baseline, the projected changes in net NOx emissions ranged from a reduction of 0.1 tons per day in 2015 to a reduction of 1.3 tons

per day in 2022.  Based on the progressively declining emissions of NOx and the projected reductions in other criteria pollutants, the final Environmental Analysis concluded the long-term impacts on air quality would be beneficial—that is, the regulations would not have an adverse environmental impact.  We note that the final Environmental Analysis did not attempt to allocate the increased usage of biodiesel and renewable diesel between (1) the ADF and LCFS regulations and (2) other causes.  Such an allocation was not made because ARB determined that the projected increased use of these fuels, whatever the cause, reduced air pollutants, including NOx.  This reduction led to the conclusion that the environmental impact was not adverse.

The final Environmental Analysis attempted to justify its use of the 2014 baseline for analyzing NOx emissions by discussing the possibility of comparing project NOx emissions to conditions existing in 2009—the year ARB prepared and adopted the original LCFS regulations.  The final Environmental Analysis stated:

> "In the interest of public disclosure, ARB staff examined the current and expected future emissions of NOx from biodiesel relative to the NOx emissions from biodiesel that were occurring prior to the adoption of the original LCFS (2009).  In 2009, there were few [new technology diesel engines], no renewable diesel, and little biodiesel in California, so the NOx emissions from biodiesel were minimal.  Staff re-evaluated the 2009 data and determined that NOx emissions were approximately 0.3 [tons per day] greater than reported in the Draft ISOR and E[nvironmental Analysis].  However, since 2009, NOx emissions from biodiesel have increased with the increased use of biodiesel resulting from multiple incentives related to biodiesel since 2009.  Thus, it is unclear and impossible to determine what portion of the increase in use is attributable to the original LCFS."  (Underlining omitted.)

This discussion continued with a description of the incentives created by federal regulations for fuel standards and federal tax incentives.  The final Environmental Analysis stated the view of ARB's staff that the economic incentives in the federal measures were more instrumental than the LCFS regulations in bringing biodiesel to California post-2009.  The final Environmental Analysis stated California's proportionate

18.

share of the national supply of fuel was approximately 11 percent and noted California did not use its proportionate share of the nation's biodiesel, but used more that its proportionate share of renewable diesel. Because renewable diesel has lower NOx emissions, California's emission of NOx is less than if it used its proportionate share of biodiesel and renewable diesel. The final Environmental Analysis concluded that the increased use of renewable diesel, combined with increased new technology diesel engine adoption, "will cause the biodiesel-related NOx emissions in California to continue to decrease and ultimately return to 2009 levels by 2023."[14] In view of the other factors promoting alternative fuels, the final Environmental Analysis also concluded "it is certainly possible that biodiesel use in California would continue at or near existing levels—or even increase—in the absence of an LCFS regulation."

### 3. Comments and ARB's Responses

Another place where NOx emissions were addressed is the public comments to the draft Environmental Analysis and ARB's responses. Those comments included a challenge to ARB's use of a 2014 baseline to analyze the impacts of the 2015 LCFS regulations. One comment asserted an earlier baseline should have been used and an assessment made of the environmental changes between the adoption of the original LCFS regulations and the adoption of the 2015 LCFS regulations. ARB's response to the comment stated that an environmental baseline predating the beginning of the 2015 administrative proceedings (1) would be misleading, (2) was not required by law, and (3) was not required by *Poet I*. ARB's response stated it did not agree that an earlier "baseline would yield meaningful information for environmental analysis."

Another comment interpreted the information provided in the draft Environmental Analysis to mean the readoption of the LCFS regulations would result in additional NOx

---

[14] The reference to "biodiesel-related NOx emissions" probably was meant to cover the NOx emissions from both biodiesel and renewable diesel, not just biodiesel.

emissions of 1.29 tons per day. ARB's response explained that the figure of 1.29 tons per day for 2015 appearing in its disclosure documents represented the NOx emissions attributable to the use of biodiesel blends. The figure was higher than the NOx emissions that would have occurred if only conventional diesel was used to fulfill diesel fuel demand in California. As biodiesel was already used in 2015 to fulfill California's diesel fuel demand, ARB's response stated:

> "[T]he emissions the commenter refers to are already occurring as part of the current conditions. [¶] Thus, the 2014 and 2015 NOx emissions (1.35 [tons per day] in 2014 and 1.29 [tons per day] in 2015) associated with biodiesel use are not NOx increases resulting from the implementation of the proposed regulation starting in 2016, but are estimated emissions associated with current conditions. For purposes of the E[nvironmental Analysis], ARB analyzed impacts against 2014 conditions, the time when the environmental analysis began. ARB staff's analysis of NOx emissions from 2014 through 2023 (displayed in Table B-1), shows that NOx emissions would decrease over time with the implementation of the regulatory proposal."

In other words, the 1.29 tons per day of NOx emissions referred to in the comment were not incremental NOx emissions caused in 2015 by the LCFS regulations operating at that time. When the total of 1.29 tons per day was compared to the 1.35 tons per day from 2014, it showed NOx emissions were decreasing.

Another comment raised the subject of cumulative impacts. (See § 21083, subd. (b)(2); Guidelines, §§ 15130 [discussion of cumulative impacts], 15355 [definition of cumulative impact].) ARB's response stated the implementation of the proposed ADF regulations would mitigate any potentially significant NOx emission impacts resulting from increased use of biodiesel associated with the proposed LCFS regulations. Based on this mitigation, the response concluded the "adoption of the proposed LCFS and ADF Regulations would not result in a cumulatively considerable contribution to a significant adverse [impacts] to long-term air quality." (Underlining omitted.)

20.

The public's comments and ARB's responses to the comments were appended to the environmental analysis and were considered by the Board at its hearings in September 2015.

### 4. ARB's Return to the Writ

In November 2015, ARB filed its return to the February 2014 writ together with the final Environmental Analysis, ARB's responses to comments, and other supporting documents. The return explained ARB's attempt to comply with paragraph 3 by stating "[t]he Board addressed whether the project (the proposed LCFS and Alternative Diesel Fuel ('ADF') regulations) will have a significant adverse effect on the environment as a result of increased NOx emission." The return then set forth findings about NOx emissions caused by short-term construction projects for new or modified facilities built to satisfy the fuel demands incentivized by ARB's regulations. The return next addressed the emissions caused by using biodiesel, stating ARB found:

> "[1] that use of biodiesel can increase NOx emissions in some engines, depending in part on feedstock and blend level;
>
> "[2] that total NOx emissions from biodiesel will decline from the 2014 baseline level under the proposed LCFS and ADF regulations; and
>
> "[3] that the use of biodiesel consistent with the proposed regulations will not result in a significant adverse impact to air quality.
>
> "(Exhibit C at pp. 4-5, 14; *see also* Exhibit A at p. 4 [adopting findings].) Overall, ARB found that the LCFS and ADF regulations and the compliance responses to those regulations would result in long-term beneficial impacts to air quality through reductions in criteria pollutants (which include NOx emissions). (Exh. C at p. 1.) These findings are supported by substantial evidence. (E.g, Exhibit D at p. 30-31, 56-63, 127-130 [excerpts of EA]; Exhibit E [ADF ISOR Appendix B].) This satisfies paragraph 3 of the peremptory writ."

Plaintiffs objected to ARB's return, contending ARB had not complied with paragraph 3. Plaintiffs argued ARB had failed to consider the original LCFS regulations, which were part of the project. Plaintiffs also challenged ARB's use of a 2014 baseline,

21.

arguing the later baseline (1) allowed ARB to avoid acknowledging the *past* (i.e., 2010-2015) increases in NOx emissions caused by the original LCFS regulations and (2) skewed the analysis of the impact of *future* NOx emissions by comparing predicted future emissions to a baseline made higher by the NOx emissions caused by the original LCFS regulations, which became effective in January 2010. Plaintiffs contended ARB's approach violated paragraph 3 and CEQA by breaking the project into pieces and pretending the effect of the first piece (i.e., the original LCFS regulations) was not an environmental impact attributable to the project as a whole.

ARB's response contended plaintiffs' arguments about the "project" and the correct baseline misinterpret paragraph 3. In ARB's view, paragraph 3 covered only future emissions. Based on this interpretation, ARB contended its adoption of the new 2015 LCFS regulations and new ADF regulations was a lawful exercise of its discretionary authority.

### 5. *Trial Court's Order Discharging the Writ*

On January 5, 2016, the trial court filed an order without holding a hearing. The order (1) stated the court had read and considered plaintiffs' objections and ARB's response and (2) found ARB had demonstrated satisfactory compliance with the February 2014 writ. Based on this finding, the court ordered the writ discharged.

### E. The Scope of Paragraph 3 and the Meaning of "Project"

### 1. *Parties' Interpretations of "Project"*

Plaintiffs contend the term "project" used in paragraph 3 includes the whole of an action and, as applied in this case, the whole of the action encompasses both the original LCFS regulations and the 2015 LCFS regulations. In contrast, ARB contends "project" is a reference to the proposed LCFS regulations mentioned in other paragraphs of our disposition and the February 2014 writ, which ARB interprets to mean any new LCFS regulations that ARB might have considered on remand.

22.

## 2.    *Project Means the Whole of an Action*

We used the word "project" in our disposition because of its breadth and its role in defining the scope of CEQA.  We used "project" in the same sense it is used in CEQA, the Guidelines and our many published CEQA decisions.

CEQA defines "'[p]roject'" to mean "an *activity* which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is [¶] ... directly undertaken by any public agency."  (§ 21065, subd. (a), italics added.)  The term "activity" plays on important role in the definition of "project"—a role reflected in the statement that "'"project" refers to the *underlying activity* which may be subject to approval'" and not the approval of that activity.  (*California Unions for Reliable Energy v. Mojave Desert Air Quality Management Dist.* (2009) 178 Cal.App.4th 1225, 1238 (*CURE*); see Guidelines, § 15378, subd. (c).)

The terms "activity" and "activities" appear throughout CEQA and the Guidelines, but they are not defined.  The Guidelines' definition of "[p]roject," however, substitutes the phrase "the whole of an action" for the statutory phrase "[a]n activity."  (Guidelines, § 15378, subd. (a).)  Thus, courts routinely state the term "project" means the whole of an action.  (E.g. *North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 858; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 730.)

The broad interpretation of "project" to encompass "the whole of an action" (Guidelines, § 15378, subd. (a)) is designed to provide the fullest possible protection of the environment within the reasonable scope of CEQA's statutory language.  (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1222 (*Tuolumne CCRG*); *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653 ["CEQA's conception of a project is broad"]; Guidelines, § 15003, subd. (f).)  This broad interpretation ensures CEQA's

23.

requirements are not avoided by chopping a proposed activity into bite-sized pieces which, when taken individually, may have no significant adverse effect on the environment. (*Tuolumne CCRG*, *supra*, at p. 1223.)

### 3. *Projects Involving Legislative Action*

Guidelines section 15378, subdivision (a)(1) provides examples of "activity directly undertaken by any public agency." The examples include building physical structures, such as "public works construction and … improvements to existing public structures." (*Ibid*.) Direct agency "activity" also includes "enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans." (*Ibid*.) These latter examples support the conclusion that the term "activity" includes a state agency's enactment of regulations. (See *CURE*, *supra*, 178 Cal.App.4th at p. 1240 [the adoption of a rule or regulation can be a project subject to CEQA]; *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1412.)

In *Poet I*, there was no dispute that the adoption of the original LCFS regulations was a "project" for purposes of CEQA. More precisely, the "activity" constituting the "project" was ARB's action in enacting the regulations plus its actions in implementing of the regulations (which includes enforcement activity). The concept of "activity" is not central to the parties' dispute over what paragraph 3 meant when it used the term "project." Instead, that dispute can be phrased as what constitutes "the whole of [ARB's] action." (Guidelines, § 15378, subd. (a).)

### 4. *Legal Test for Determining Which Acts Are Part of the Whole*

Answering the question about what constitutes the whole of ARB's action involves two steps. The first step identifies the legal test for determining the acts or activities that constitute the whole CEQA project. The second step applies that test to the facts of this case.

24.

We discussed the scope of the activity constituting a project in *Tuolumne CCRG*, *supra*, 155 Cal.App.4th at pages 1222 through 1227, and the appropriate legal test for determining which acts to include in, or exclude from, the project. *Tuolumne CCRG* involved physical structures—a proposed road realignment and a proposed Lowe's home improvement center—that would become part of the physical environment, rather than the adoption of an ordinance or regulation. Despite the differences between physical construction projects and legislative action, we conclude the same test applies when determining what constitutes the whole of the action. In *Tuolumne CCRG*, the test we adopted and applied was whether the acts in question were "'related to each other.'" (*Tuolumne CCRG*, *supra*, 155 Cal.App.4th at p. 1225, quoting *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726.)

We described the reach of this test by stating there are different ways actions can be related to (i.e., connected with) each other. (*Tuolumne CCRG*, *supra*, 155 Cal.App.4th at pp. 1226-1227.) For instance, the two actions could be "related in (1) time, (2) physical location and (3) the entity undertaking the action." (*Id*. at p. 1227.) We also examined how closely related the acts were to the overall objective of the project, stating: "The relationship between the particular act and the remainder of the project is sufficiently close when the proposed physical act is among the 'various steps which taken together obtain an objective.' (Robie et al., Cal. Civil Practice–Environmental Litigation (2007) § 8.7.)" (*Tuolumne CCRG*, *supra*, at p. 1226.)[15]

In *Tuolumne CCRG*, the city had conditioned the opening of the home improvement center on the completion of the road realignment. (*Tuolumne CCRG*,

---

[15] Another way to phrase the question of whether a particular act is a step taken towards the achievement of the proponent's objective is to ask "whether the act is part of a coordinated endeavor." (*Tuolumne CCRG*, *supra*, 155 Cal.App.4th at p. 1228, citing *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 639 [series of acts all part of single, coordinated endeavor] (*ACE*).)

*supra*, 155 Cal.App.4th at p. 1227.)  Thus, the realignment was a necessary step to the achievement of Lowe's objective of opening a new store.  Based on "the various connections between the road realignment and the proposed home improvement center," we concluded they were "related acts that constitute a single CEQA project."  (*Ibid.*)

### 5.  *Application of the Test to This Case*

Application of the "'related to each other'" test adopted in *Tuolumne CCRG* to the original LCFS regulations, the 2015 LCFS regulations, and the ADF regulations is not difficult.  They clearly are related to one another and that relationship is extremely close.  They share the same overall objective of reducing greenhouse gases.  They were adopted by the same entity, ARB, for the purpose of achieving that objective.  The regulations cover activity in the same geographical area—California.  They address the same subject matter—the chemical composition of transportation fuels and the chemical makeup of the emissions created by burning those fuels.  The temporal connection also is close, as is demonstrated by the fact the 2015 LCFS regulations replaced the original LCFS regulations, making them sequential.

Therefore, we conclude that for purposes of CEQA the activities associated with the original LCFS regulations, the 2015 LCFS regulations, and the ADF regulations constitute a single project.  Stated another way, they constitute an "activity directly undertaken by [a] public agency" (§ 21065, subd. (a)) and are "part of a single, coordinated endeavor."  (*ACE*, *supra*, 116 Cal.App.4th at p. 639.)  It follows that those same activities are the "project" referred to in paragraph 3 of the writ.

### 6.  *Fulfilling the Writ's Purpose*

As we stated under the heading labeled "*Corrective Action*," "[s]ubdivision (a)(3) of section 21168.9 authorizes this court to 'mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with [CEQA].'"  (*Poet I*, *supra*, 218 Cal.App.4th at p. 764.)  Thus, paragraph

3 was the mandate for specific action necessary to bring ARB's decision to adopt the LCFS regulations into compliance with CEQA. Thus, interpreting the term "project" in paragraph 3 to include the original LCFS regulations, the 2015 LCFS regulations, and the ADF regulations is necessary to accomplish the purposes of the February 2014 writ.

A simple way to conceptualize the goal of the writ is to consider the information that would have been provided if ARB had complied with CEQA in the first place. ARB's failure to comply with CEQA meant ARB's first set of environmental disclosure documents failed to provide all of the information required by CEQA. Paragraph 3 sought to remedy that informational deficit by directing ARB to provide the missing information. From an informational prospective, the ARB's remedial actions should have placed the public and decision makers in the same positions they would have occupied if the first set of environmental disclosure documents had satisfied CEQA.

CEQAs' purpose in requiring an environmental disclosure document is "to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447 (*Neighbors for Smart Rail*).) The benefits of informed decision makers are obvious and need not be described here. The benefits of an informed public was explained over 40 years ago by this court:

> "Only by requiring the [public agency] to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree." (*People v. County of Kern* (1974) 39 Cal.App.3d 830, 842; Guidelines, § 15003, subd. (e).)

Here, voters will not be informed of the environmental values of ARB and the Board if they are not informed about all of the project's impacts, including the impacts of the original LCFS regulations. In particular, the public is entitled to know that ARB and the Board were willing to accept the risk of higher levels of NOx emissions, with the

27.

attendant increase in smog and human health impacts, in exchange for lower overall emissions of greenhouse gases to combat global warming. This information, which provides insights into ARB's environmental values, was omitted from ARB's earlier environmental disclosure document and this deficiency must be corrected if the purpose of CEQA and the February 2014 writ is to be fulfilled.

Here, ARB has made no realistic attempt to show its narrow interpretation of the term "project" serves the purposes of CEQA and the writ. For instance, ARB makes no attempt to carefully identify the informational deficit in its earlier environmental disclosure document and then show that deficit was put right.

To summarize, interpreting paragraph 3's use of the term "project" to include the original LCFS regulations, the 2015 LCFS regulations, and the ADF regulations (1) addresses the CEQA defects that paragraph 3 was designed to correct, (2) implements the intention of this court, and (3) is how "project" would be interpreted by an objectively reasonable attorney familiar with CEQA, the Guidelines, published CEQA decisions discussing the term "project," and the CEQA violation to be remedied.

F.      Baseline

1.      *Parties' Contentions*

Plaintiffs contend that the 2014 baseline for NOx emissions adopted by ARB in its analysis of the project's impact was a "regulatory sleight of hand [that] conceals the fact that California will continue to experience increased NOx emissions caused by the original LCFS regulation until at least 2021."[16] In response, ARB supports its use of the

---

**16**      This argument is based in part on the final Environmental Analysis's prediction that biodiesel-related NOx emissions in California ultimately will decrease to 2009 levels by 2023, which logically implies that NOx emissions from biodiesel in each year before 2023 will be greater than the NOx emissions from biodiesel in 2009. Thus, plaintiffs' statement about increased NOx emissions is accurate. However, their statement that the increases are caused by the original LCFS regulations is not accurate because it goes beyond facts and findings in the record. Specifically, ARB has yet to resolve the

2014 baselines by noting the absence of any reference in the writ to baseline requirements. ARB relies on its interpretation of the term "project" and Guidelines section 15125, subdivision (a), which states conditions existing at the time the environmental analysis is commenced normally constitute the baseline conditions used to determine whether an impact is significant.

The dispute over the appropriate baseline cannot be resolved without the proper application of the term "project" to the facts of this case. When the whole of a project is properly identified, then the conditions defining the project's baseline can be determined. Here, ARB's interpretation of "project" was too narrow and, consequently, it chose the wrong year as the conditions establishing the baseline for NOx emissions.

### 2. Principles of Law Governing Baseline Selection

Our Supreme Court has recognized that to achieve CEQA's goal of informing decision makers and the public of any significant environmental effects a project is likely to have, the environmental disclosure document (such as an EIR) "must delineate environmental conditions prevailing absent the project, defining a baseline against which predicted effects can be described and quantified." (*Neighbors for Smart Rail, supra,* 57 Cal.4th at p. 447.) Thus, the concept of a baseline is a key component in identifying and quantifying a project's environmental effects. CEQA does not use or define the term "baseline," but Guidelines section 15125, subdivision (a) provides in part:

> "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, *at the time environmental analysis is commenced*, from both a local and regional perspective. This environmental setting will *normally* constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Italics added.)

---

causation questions and how much of each year's increased NOx emissions was or will be caused by the project, rather than other factors.

In *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, the court relied on this provision and case law "for the principle that the baseline for an agency's primary environmental analysis under CEQA must ordinarily be the *actually* existing physical conditions rather than *hypothetical* conditions that could have existed under applicable permits and regulations." (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 448, citing *Communities for a Better Environment*, *supra*, at pp. 320-322.) The court addressed the problem of defining an existing conditions baseline in circumstances where the existing conditions themselves change or fluctuate over time. (*Communities for a Better Environment*, *supra*, at pp. 327-328.) The court resolved this problem by concluding a single, uniform rule for determining existing conditions was not appropriate. (*Id.* at p. 328.) Instead, the court interpreted CEQA and the Guidelines as giving the agency "the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured." (*Ibid*.) Thus, the court held the agency's discretion "relate[s] to the choice of a measurement technique for existing conditions, not the choice between an existing conditions baseline and one employing solely conditions projected to prevail in the distant future." (*Neighbors for Smart Rail*, *supra*, at p. 449, describing *Communities for a Better Environment*.)

*Neighbors for Smart Rail*, *supra*, 57 Cal.4th 439, is more pertinent to the baseline issues raised in this appeal. In that case, the Supreme Court extended its discussion of baselines to following question: "Is it ever appropriate for an EIR's significant impacts analysis to use conditions predicted to prevail in the more distant future, well beyond the date the project is expected to begin operation, to the exclusion of an existing conditions baseline?" (*Id*. at p. 453.) The court first concluded agencies had such discretion, observing that the norm was an existing conditions baseline and a departure from the norm is permitted if it "promotes public participation and more informed decisionmaking by providing a more accurate picture of a proposed project's likely impacts." (*Ibid*.) The

30.

court next concluded that when an agency chooses to forgo the existing conditions analysis and evaluate only the impacts on future conditions, it must provide a justification for that choice. (*Id*. at p. 454.)

In summary, the Guidelines and foregoing cases set forth two main principles relevant to this appeal. First, an existing conditions baseline is ordinarily used in analyzing a project's environmental impacts. Second, a lead agency has the discretion to choose to evaluate the impacts on future conditions, so long as it provides an adequate justification for omitting an existing conditions analysis. These principles serve CEQA's informational purpose by insisting the "CEQA analysis employ a realistic baseline that will give the public and decision makers the most accurate picture practically possible of the project's likely impacts." (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 449.)

### 3.      *Application of Principles*

The project in this case includes the original LCFS regulations. Thus, the normal baseline would be the physical conditions existing at the time the environmental analysis of the original LCFS regulations commenced. (Guidelines, § 15125, subd. (a); *Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 455 ["Guidelines establish the default of an existing conditions baseline"].) Exactly when ARB's environmental analysis commenced is not clear from the record. It probably occurred after January 2007, when Governor Schwarzenegger directed ARB to determine if a LCFS could be adopted as a discrete early action under the California Global Warming Solutions Act of 2006. (*Poet I*, *supra*, 218 Cal.App.4th at p. 700.) It might have commenced in "August 2007[ when] ARB began consulting with the public about a LCFS." (*Id*. at p. 701.) Thus, the normal, existing conditions baseline for NOx emissions might have described conditions existing in August 2007 or, if a full calendar year was used to define the baseline conditions, the NOx emissions from calendar year 2006.

ARB used a 2014 baseline and thought such a baseline described existing conditions because ARB misconstrued and misapplied the term "project." The adoption of the original LCFS regulations predates 2014 by several years and, therefore, the 2014 baseline does not describe the conditions existing when the environmental analysis of the project commenced. Nevertheless, ARB's use of a 2014 baseline contrary to the norm established by Guidelines section 15125 might be allowed under the exception to that section's general requirement that an existing conditions baseline be used. In view of this possibility, we consider whether ARB's choice of a 2014 baseline fits within that exception. An agency that deviates from the norm must provide an adequate justification for omitting an existing conditions analysis. (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 454.) ARB could have justified its use of a 2014 baseline by demonstrating an existing conditions "analysis would [have been] uninformative or misleading to decision makers and the public." (*Id.* at p. 453.) Restated from the opposite perspective, ARB could have shown the 2014 baseline "promote[d] public participation and more informed decisionmaking by providing a more accurate picture of a proposed project's likely impacts." (*Ibid.*)

ARB attempted to justify the use of a 2014 baseline in the paragraph of the final Environmental Analysis that began: "In the interest of public disclosure, ARB staff examined the current and expected future emissions of NOx from biodiesel relative to the NOx emissions from biodiesel that were occurring prior to the adoption of the original LCFS (2009)." The final Environmental Analysis proceeded to make three main points. First, it stated that "[i]n 2009, … the NOx emissions from biodiesel were minimal." Second, it stated that "since 2009, NOx emissions from biodiesel have increased with the increased use of biodiesel" and attributed the increased biodiesel use to "multiple incentives." This statement identifies the difficulty of determining causation—that is, apportioning the increased use of biodiesel among the factors causing the increase. Third, the final Environmental Analysis stated "it is unclear and impossible to determine

what portion of the increase in use is attributable to the original LCFS." The final Environmental Analysis then discussed the federal regulations promoting biodiesel use.

ARB's defense of the 2014 baseline also included its response to a comment asserting the 2014 baseline was inappropriate. ARB stated it did not agree that an earlier "baseline would yield meaningful information for environmental analysis."

As described below, we conclude ARB has not demonstrated its "CEQA analysis employ[ed] a realistic baseline that [gave] the public and decision makers the most accurate picture practically possible of the project's likely impacts." (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 449.) First, the assertion that NOx emissions from biodiesel in 2009 were minimal suggests a 2009 baseline would have been small, a fact that does not make its use uninformative or misleading. Second, the difficulty in sorting out causation among various factors does not justify ARB's avoidance of the question for the period preceding the effective date of the 2015 LCFS regulations. ARB, as the lead agency performing the environmental analysis, sits as the trier of fact and we are aware of no rule of law that allows an agency to escape that responsibility simply because the factual question is difficult. (See *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 102, fn. 31 [public agency acts as the trier of fact].) Moreover, ARB is not expected to provide an exact or perfect answer. (Guidelines, § 15151 [perfection in evaluation of environmental effects is not required].) ARB's environmental analysis of this project has demonstrated it can make projections and estimates. Therefore, we conclude ARB can resolve the factual questions of causation based on estimates that are supported by substantial evidence. (Guidelines, §§ 15144 [forecasting], 15384 [substantial evidence].)

As to the final Environmental Analysis's statement that it would be "impossible" to apportion increases among the original LCFS regulations and other factors, counsel for ARB stated during oral argument that ARB was willing and able to decide the issues relating to causation. Thus, ARB has conceded such findings are not "impossible."

33.

Similarly, ARB's conclusory statement that use of a baseline earlier than 2014 would not yield meaningful information is unpersuasive, because it based on ARB's supposed inability to make findings of fact about the causes of increased biodiesel use.

Therefore, we conclude ARB failed to justify its use of a 2014 baseline for the project's NOx emissions and, as a result, ARB failed to comply with CEQA and paragraph 3. When this court decided to allow the original LCFS regulations to remain operative pending ARB's compliance with CEQA, we did not intend to deprive the public or decision makers of information about increased NOx emissions caused by the original LCFS regulations during that compliance period. A proper baseline would identify the conditions that existed before any impacts of the original LCFS regulations began to accrue and, thus, would provide a solid foundation for identifying those impacts. (See pt. II.G, *post* [baseline on remand].)

G. <u>Meaning of the Phrase "Will Have"</u>

The last question about the proper interpretation of paragraph 3 involves the command that ARB "[a]ddress whether the *project will have* a significant adverse effect on the environment as a result of increased NOx emissions .…" (Italics added.) ARB points to the phrase "project will have" in paragraph 3 and argues it refers to effects of the 2015 LCFS regulations "that might occur from those new regulations *in the future*." (Underlining changed to italics.) ARB's interpretation is based in large part on its incorrect view that "project" referred only to the 2015 LCFS regulations and excluded the original LCFS regulations. Nonetheless, ARB's view that paragraph 3 was concerned with future effects only is based in part on the verb phrase "will have."

Part of the background for the wording of paragraph 3 is provided in the section of our opinion addressing the CEQA violation relating to NOx emissions. In that section, we stated: "On remand, ARB may not simply assume that the LCFS regulations will not have a significant adverse impact on the environment. ARB must make a finding of fact,

34.

supported by substantial evidence, on the question whether the project will have a significant adverse effect on the environment as a result of the potential increase in NOx emissions." (*Poet I*, *supra*, 218 Cal.App.4th at p. 740.) We used the phrase "will have" instead of the phrase "may cause" appearing in the definition of "project" (§ 21065) for two reasons. The first was an attempt to reduce the chances that ARB would continue its avoidance of the issue (as it did with its assumption) by making alternative findings that the project might or might not cause increased NOx emissions. The second was that the phrases "may cause" or "may have" are more appropriate for the inquiry conducted at the initial-study stage of review when a lead agency applies the fair argument standard to determine whether the project *may cause* or *may have* a significant environmental impact and, thus, requires the preparation of an EIR to complete a full environmental review of that impact. (See § 21080, subd. (d) [if "project may have a significant effect on the environment, an [EIR] shall be prepared"]; Guidelines, §§ 15063, 15365.)

As to the meaning of the phrase "will have," we note the verb "will" has many definitions and there are differences within those definitions as to timing. For instance, "will" can be "used to express simple futurity" or "used to express simple action or intention without conscious reference to future time." (Webster's 3d New Internat. Dict. (1993) p. 2616, col. 3.) Also, "will" can be "used to express capability." (*Ibid*.) Here, the disposition in *Poet I* used "will have" to refer to the project's *capability* of causing adverse environmental effects due to increased NOx emissions. We intended ARB to address this capability for the project as a whole (i.e., original and modified regulations) and "make findings (supported by substantial evidence) regarding the potential adverse environmental effect of increased NOx emissions, and adopt mitigation measures in the event the environmental effects are found to be significant." (*Poet I, supra,* 218 Cal.App.4th at p. 767.)

In any event, the ambiguity in the phrase "will have" need not be discussed at length because ARB did not comply with paragraph 3, regardless of whether "will have"

is interpreted as referring (1) to the future only or (2) to the capability to cause environmental effects, past and future. Under either interpretation of paragraph 3, ARB did not comply with the writ because ARB wrongly construed "project" and, in turn, failed to adopt a proper baseline. As explained below, these errors meant ARB's analysis of the NOx emissions understated the amount of those emissions potentially attributable to the LCFS regulations.[17]

If one assumes (as contended by ARB) that paragraph 3 was concerned only with future impacts, the relevant impacts are those occurring after the 2015 LCFS regulations went into effect on January 1, 2016. ARB has chosen to discuss impacts on a year-by-year basis, a convention that we will use in this discussion. Thus, in 2015, ARB should have addressed NOx impacts in each year from 2016 through at least 2021. That analysis, described in broad terms, includes the following three steps.

First, ARB should have predicted the amount of NOx emissions for each year and subtracted the baseline NOx emissions from that amount. Subtracting the baseline figure would have yielded the total increase in NOx emissions for each year. Second, ARB should have made findings of fact about causation and allocated the increase among the factors causing the increase, which might have included the 2015 LCFS regulations. Third, ARB should have determined whether the amount of any increase caused by the LCFS regulations was "significant" as that term is used in CEQA. (See fn. 8, *ante*.)

ARB's use of the wrong baseline skewed the calculation performed in the first step. The resulting error was so large that ARB did not reach the second and third steps of the analysis. More specifically, NOx emissions from the combination of biodiesel and renewable diesel increased between 2009 and 2014. Use of 2014 as the baseline of NOx emissions included this increase and, thus, overstated the baseline figure. The inflated

---

**17** The term "potentially" is used because the entire increase may not be caused solely by the project. The factual questions relating to causation are discussed in part I.F.3, *ante*.

36.

baseline had the effect of understating the increase in NOx emissions for 2016 and subsequent years. Consequently, ARB's use of an inappropriate baseline as the point of comparison for the project's NOx emissions requires reversal even if paragraph 3 were interpreted as (1) directing ARB to address only future (i.e., 2016 through 2021) NOx emissions and their causes and (2) allowing it to skip over the potential impacts from 2009 through 2015. In sum, ARB's analysis of NOx emissions was defective even if it is given the benefit of the ambiguity in paragraph 3's use of the phrase "will have."

H.     Prejudice

The last element plaintiffs must establish to obtain a reversal is prejudice. Accordingly, we consider whether ARB's failure to comply with the writ and CEQA was prejudicial. A starting point for this inquiry is the proposition that employing an incorrect baseline is not necessarily prejudicial. For example, in *Neighbors for Smart Rail*, *supra*, 57 Cal.4th 439, the Supreme Court determined the use of a wrong baseline for analyzing traffic was "an insubstantial, technical error that cannot be considered prejudicial." (*Id*. at p. 463.)

In this case, we conclude that ARB's failure to comply with paragraph 3 resulted in its environmental disclosure documents omitting information (1) required by CEQA and (2) necessary to an informed discussion. (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 382 [test for prejudice].) At least two gaps in information occurred. First, ARB's disclosure did not analyze the increase in NOx emissions for the period from 2009 through the readoption of the regulations. Information about NOx emissions from this period was necessary to inform the public and decision makers. Second, the discussion of the NOx emissions forecast to occur after the adoption of the 2015 LCFS regulations was inaccurate because the wrong baseline was used and, as a result, the discussion misleadingly understated the increase in NOx emissions for 2016 and the years following. This understatement allowed ARB to

37.

conclude NOx emissions would decrease and to avoid (1) making findings of fact allocating the increased emissions among the various causes and (2) determining whether the amount of the increased emissions caused by the project was significant. These gaps in information are at the heart of the analysis used to determine whether a project is likely to have a significant adverse environmental impact and, thus, cannot be regarded as insubstantial, technical errors. Consequently, we conclude plaintiffs have shown the failure to comply with paragraph 3 was prejudicial to CEQA's informational goals.

II.     REMEDY

ARB's prejudicial failure to comply with paragraph 3 is more than a failure by a public agency to fulfill the terms of a writ of mandate. The February 2014 writ was issued to remedy violations of CEQA. Thus, ARB's failure to comply with paragraph 3 also constitutes a violation of CEQA. In other words, since 2009, ARB has been in violation of CEQA because its environmental disclosure documents have not provided the public and decision makers with statutorily required information about the project's NOx emissions. As a result, ARB's corrective action taken in reliance on those environmental disclosure documents did not comply with CEQA.

Accordingly, the appellate relief granted in this case is shaped by the fact that ARB's actions failed to comply with the writ and violated CEQA. The relief granted must remedy the dual nature of ARB's wrong. Our discussion of the appropriate remedy begins with the general principles governing the judicial relief available for a failure to comply with the terms of a writ of mandate and then addresses CEQA's influence on the relief available.

A.     Failure to Comply with the Writ

1.     Basic Principles

No statute specifically defines the appellate relief available when a trial court erroneously discharges a writ of mandate. Code of Civil Procedure section 906 sets forth

the general authority of appellate courts to provide relief. Consequently, that section provides the statutory foundation for the appellate relief available in cases of erroneously discharged writs. Code of Civil Procedure section 906 states that an appellate court reviewing an appealable order "may affirm, reverse or modify" the order. The appellate court also "may direct the proper … order to be entered, and may, if necessary or proper, direct … further proceedings to be had." (Code Civ. Proc., § 906.) The express statutory authority to direct further proceedings that are necessary and proper fits with an appellate court's "inherent power to decide any issue deemed necessary for a proper disposition of the case." (*Canal-Randolph Anaheim, Inc. v. Wilkoski* (1978) 78 Cal.App.3d 477, 495.)

Reported decisions provide few examples of relief granted after an appellate court determines an order discharging a writ of mandate was granted in error. The first and obvious type of relief is the reversal of the trial court's order discharging the writ. (See *Sanders v. City of Los Angeles* (1970) 3 Cal.3d 252, 261-262 [Court of Appeal's reversal of order discharging the writ affirmed] (*Sanders*); *Lewis v. Steifel* (1950) 98 Cal.App.2d 648, 652 ["order discharging and vacating writ is reversed"].) In addition, the appellate court may expand upon the reversal by directing the trial court to order defendants to comply with the writ. (*Sanders*, *supra*, at p. 256; see *Sanders v. City of Los Angeles* (1967) 252 Cal.App.2d 488, 495 ["the court is directed to order all defendants to comply with the writ of mandate"].) The appellate court also may direct the trial court to issue "'any further appropriate orders to compel obedience to the writ.'" (*Sanders*, *supra*, at p. 262.)

To summarize, when an appellate court determines a public official or agency has failed to comply with a writ of mandate, the basic components of appellate relief are (1) reversal of the order discharging the writ and (2) instructions to the trial court to issue (a) an order directing the public official or agency to comply with the writ and (b) any further appropriate orders to compel obedience to the writ.

39.

### 2. *Determining What Further Orders are Appropriate*

The principle that a court may issue "'further appropriate orders to compel obedience to the writ'" (*Sanders*, *supra*, 3 Cal.3d at p. 262) gives rise to the question of how a court determines what is *appropriate* in a particular case. We have located, and the parties have cited, no case law explicitly addressing this question in a CEQA case. We conclude that, where a CEQA violation was addressed by the underlying writ of mandate, the determination of what further orders are *appropriate* to compel obedience with the writ is controlled and guided by CEQA's requirements, principles and policies. Consequently, a further order generally will be deemed *appropriate* if (1) the required action is among the types of relief permitted by CEQA and (2) it promotes the goal of compliance with CEQA, which is why the writ was issued in the first place. Restated in the negative, a further order is *not appropriate* in a CEQA proceeding if (1) the order contradicts express limitations on relief set forth in section 21168.9 or (2) the order is inconsistent with the purposes of CEQA.

### 3. *Discretionary Authority under CEQA to Fashion a Remedy*

The role of CEQA in guiding the determination of what further orders are appropriate in this appeal returns us to *Poet I*'s discussion of the provisions that may be included in a peremptory writ of mandate issued to remedy CEQA violations. (*Poet I*, *supra*, 218 Cal.App.4th at pp. 756-766.) We stated section 21168.9 provides that the writ may direct the agency "(1) to void, in whole or in part, a determination, finding or decision, (2) to 'suspend any or all specific project activity or activities' if certain conditions exist, or (3) to take specific action necessary to bring the determination, finding or decision tainted by the CEQA violation into compliance with CEQA." (*Poet I*, *supra*, at p. 757, fn. omitted; see § 21168.9, subd. (a)(1)-(3).) We concluded these categories of relief remain relevant to deciding what further orders may be appropriate in this appeal.

Also, section 21168.9 supplements its affirmative statement of available relief with provisions explicitly limiting the remedial action that courts may include in the writ of mandate. (*Poet I*, *supra*, 218 Cal.App.4th at p. 758; see § 21168.9, subds. (b)-(c).) Those *express* statutory limitations are not set forth here because our discussion of those limitations already is published in *Poet I*, *supra*, at page 758 and severance is discussed in part II.F, *post*. As to specific *implied* limitations, none exist because subdivision (c) of section 21168.9 states: "Except as expressly provided in this section, nothing in this section is intended to limit the equitable powers of the court." (*Poet I*, *supra*, 218 Cal.App.4th at p. 758.)

Therefore, we conclude our authority to grant appellate relief in this case is derived from (1) the general provisions in Code of Civil Procedure section 906 and (2) CEQA's provisions governing remedies.

B.     ARB's Claims of Unavailable Appellate Relief

ARB has not identified the statutory basis for this court's power to grant appellate relief, yet ARB contends our jurisdiction in this appeal is limited. Specifically, ARB claims the appellate relief available in this case cannot attempt to remedy errors in the way ARB adopted the 2015 LCFS regulations because "the court with jurisdiction over those questions is the superior court handling [plaintiffs'] direct challenge to the new regulation."

ARB also addresses the possibility that this court might enter relief affecting the 2015 LCFS regulations under the theory that the relief is preliminary in nature. ARB contends plaintiffs have not shown the requisite elements for preliminary relief—namely, the likelihood of success on the merits and irreparable injury absent relief.

We reject ARB's argument that we lack the jurisdiction or authority to suspend the 2015 LCFS regulations. First, ARB has cited no statutory authority for such a jurisdictional limitation on the general authority granted by Code of Civil Procedure

section 906.  Second, ARB has cited no case law recognizing such a limitation on the authority of an appellate court.  Third, this court has not limited or surrendered the authority to remedy failures to comply with the February 2014 writ or enforce our disposition in *Poet I.*  For instance, *Poet I* contains no provision surrendering or otherwise limiting our authority in subsequent appeals.  Therefore, we conclude the analysis set forth in part II.A, *ante* defines our authority to enter relief in this appeal, which is limited to ARB's failure to comply with the writ and the related violation of CEQA pertaining to NOx emissions.[18]

As to ARB's specific argument about our lack of *authority to suspend* the 2015 LCFS regulations, we note that ARB adopted the 2015 LCFS regulations as part of its attempt to comply with paragraph 3 of the February 2014 writ.  That attempt did not comply and, as a result, the initial violation of CEQA remains uncorrected and taints the 2015 enactment.  To remedy the continuing CEQA violation, we conclude the further appropriate orders in this case might include suspending the 2015 LCFS regulations because suspension is a type of relief expressly authorized by subdivision (a)(2) of section 21168.9.  In other words, suspension of the 2015 LCFS regulations might be a "necessary or proper" order under Code of Civil Procedure section 906.

To the extent ARB's argument implies plaintiffs' current request for suspension of the 2015 LCFS regulations is an improper collateral attack on the regulations, we disagree.  The challenges raised by plaintiffs in this appeal are limited to issues previously raised in *Poet I* and dealt with by the February 2014 writ.  Thus, the challenges considered in this appeal are not collateral in nature.  The directness of the

---

[18]    In other words, we are not asserting any authority (i.e., jurisdiction) to remedy CEQA violations alleged in another lawsuit, only the authority to remedy a CEQA violation that has been a part of this lawsuit since the complaint was filed in December 2009.

challenges is illustrated by, among other things, their satisfaction of the issue exhaustion requirement set forth in section 21177, subdivision (b) throughout this litigation.

C.     <u>Reversal with a Generic Order to Comply with the Writ</u>

Here, the parties impliedly accept the conclusion that the order discharging the writ should be reversed if the order was granted in error. Such a reversal would require further proceedings on remand so ARB could comply with the writ and obtain an order discharging the writ. Consequently, we consider whether our disposition should simply (1) reverse the order discharging the writ and (2) instruct the trial court to issue a generic order directing ARB to comply with the writ.

This theoretically possible disposition would have the effect of reinstating all provisions of the writ. Reinstatement, however, would give rise to disputes between the parties over how the writ's provisions should be applied to the further proceedings. The potential disputes described below demonstrate (1) a simple reversal with directions for ARB to comply with the writ is not appropriate and (2) further orders are needed to clarify matters.

### 1.     *Paragraph 6 and the Status Quo*

Reinstating the February 2014 writ would reinstate paragraph 6, which stated ARB shall continue "to adhere to the LCFS regulations standards in effect for 2013 until the corrective action is completed." (*Poet I*, *supra*, 218 Cal.App.4th at p. 767.) Paragraph 6's purpose was to preserve the status quo until ARB had complied with the writ and remedied its CEQA violations. (*Ibid*.) The parties' appellate briefing shows they do not agree on paragraph 6's continuing role, if any, after remand.

The parties have adopted different interpretations of paragraph 6's phrase "until the corrective action is completed." ARB has interpreted "is completed" to refer to the point where it finished the administrative steps in its environmental review and reapproval process. This agency-centric interpretation differs from our court-centric

43.

intent. We intended ARB's corrective action to be regarded as "completed" when that corrective action was approved by the trial court after ARB filed its return to the writ.

Under our view of when ARB's corrective action would have been completed, a reversal of the discharge order would mean that ARB's corrective action would not be regarded as "completed" for purposes of paragraph 6. Thus, paragraph 6 would continue to require ARB "to adhere to the LCFS regulations standards in effect for 2013." (*Poet I*, *supra*, 218 Cal.App.4th at p. 767.) In contrast, under ARB's interpretation, its corrective action was completed no matter what happened subsequently in court and, thus, reinstating the writ would not revive paragraph 6 or the 2013 standards. Under ARB's view, the applicable fuel standards on remand would be determined by the 2015 LCFS regulations because that version of the regulations is currently in effect.

These differing interpretations have had no effect on how this case has proceeded so far. However, these conflicting interpretations could generate uncertainty in subsequent proceedings if further orders do not clarify paragraph 6's role on remand.

### 2. *Paragraphs 6 and 11: Suspending the 2013 Standards*

Assuming the parties agreed with our interpretation of the phrase "is completed" and agreed paragraph 6 of the February 2014 writ would be reinstated on remand, a dispute would arise involving the last clause of paragraph 6. That clause states that "the LCFS regulations shall remain in operation and shall be enforceable *unless its operation is suspended as provided below*." (*Poet I*, *supra*, 218 Cal.App.4th at p. 767, italics added.) The phrase "as provided below" refers to a provision in *Poet I*'s disposition that became paragraph 11 of the February 2014 writ. Paragraph 11 states in full:

> "ARB shall proceed in good faith without delay. In the event ARB fails to proceed in good faith with diligence, this [trial] Court immediately shall vacate Paragraph 6 of this writ, which preserves the status quo and shall direct ARB to set aside the LCFS regulations (i.e., suspend the operation and enforcement of the regulations)."

44.

Plaintiffs contend ARB did not act in good faith and, therefore, whatever version of the LCFS regulations ARB believes would be in effect on remand should be suspended until ARB actually has complied with paragraph 3.  In response, ARB argues it acted in good faith and, moreover, interprets paragraphs 6 and 11 in a manner that gives them no ongoing effect, thus rendering them irrelevant to any proceedings on remand.  These arguments demonstrate that additional uncertainty would arise on remand if further orders do not resolve the parties' disputes involving paragraphs 6 and 11 of the February 2014 writ.

D.    Who Determines the Content of the Further Appropriate Orders

The need for "further appropriate orders" raises the question of which court should determine the content of those orders—this court or the trial court?  There are three possible answers.  First, we could remand to the trial court with generic directions for that court "to order defendants to comply with the writ and to make any further appropriate orders to compel obedience thereto."  (*Sanders*, *supra*, 3 Cal.3d at p. 256.)  Second, we could draft the further appropriate orders ourselves and direct the trial court to issue those orders on remand.  Third, we could divide the drafting responsibility, addressing some of the issues in our disposition and directing the trial court to draft provisions addressing other issues.

The choice among these three possibilities lies within the discretionary authority of the appellate court.  Code of Civil Procedure section 906 provides that an appellate court "*may* direct the proper … order to be entered, and *may*, if necessary or proper, direct … further proceedings to be had."  We interpret the statute's use of "may" as signaling the grant of discretionary authority.  (*Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 384 [generally, a statute using "may" grants discretion].)

45.

In this case, we choose to exercise our discretionary authority by preparing the terms of the order to be issued on remand. Our choice is based on the fact that this court (1) identified the original CEQA violations, (2) drafted the terms of the February 2014 writ designed to remedy those violations, (3) identified ARB's failure to comply with paragraph 3, and (4) is familiar with the purpose of paragraph 3 and the CEQA policies it sought to promote. Also, the present case is a CEQA proceeding and, consequently, this court occupies nearly the same position as the trial court —that is, each court sits as a court of review considering the agency's action. (*Vineyard*, *supra*, 40 Cal.4th at p. 427.) This similarity of position, coupled with the trial court's workload, supports our decision to prepare the terms of the order issued on remand.

E.      Reinstate the 2013 Standards?

The further orders we direct to be issued on remand should clarify whether the 2013 standards contained in the original LCFS regulations are reinstated and will be the operative standards pending discharge of the writ. (See pt. II.C, *ante*.) We conclude 2013 standards should not be reinstated and the February 2014 writ should be modified to prevent such a reinstatement.

We conclude that reinstating the 2013 standards would not fulfill the original purpose of paragraph 6—preservation of the status quo. *Poet I* was filed in July 2013 when the 2013 standards applied to persons subject to the LCFS regulation. Since then, circumstances have changed. On January 1, 2016, the 2015 LCFS regulations and the standards set forth in those regulations went into effect. During 2016, persons subject to the 2015 LCFS regulations filed their quarterly reports using the standards contained in the 2015 LCFS regulations. (See Cal. Code Regs., tit. 17, § 95491, subd. (a) [reporting requirements].) They also will use those standards when they will file their annual compliance report for 2016, which is due by April 30, 2017. (*Id*., subd. (a)(1)(B).) As a result, returning to the 2013 standards would be disruptive.

Therefore, we conclude the 2013 standards should not be reinstated. The further orders contained in our disposition will modify the terms of the February 2014 writ to implement this conclusion about the 2013 standards.

F.     <u>Voiding and Suspending?</u>

If the 2013 standards are not reinstated, should we adopt plaintiffs' position and suspend operation of the regulations or, alternatively, should we adopt ARB's position and allow the 2015 LCFS regulations and ADF regulations to remain in effect? As the 2015 LCFS regulations and ADF regulations currently are in effect, the question is whether to invalidate (i.e., suspend) those regulations in whole or in part.

*1.     Basic Principles*

Section 21168.9 states that a writ of mandate addressing a failure to comply with CEQA may direct "the determination, finding, or decision be voided by the public agency, in whole or in part" and, when certain conditions exist, may direct the public agency and real parties in interest to "suspend any or all specific project activity or activities." (§ 21168.9, subd. (a)(1)-(2).) The phrases "in whole or in part" and "any or all" raise the possibility of severing some part of the approvals and the project from other parts and then invalidating or suspending only the severed parts. Indeed, CEQA makes the consideration of severance mandatory by stating: "Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with [CEQA] and only those specific project activities in noncompliance with [CEQA]." (§ 21168.9, subd. (b); see § 15 [shall is mandatory].) However, a suspension limited to noncompliant project activities is allowed "only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with [CEQA], and (3) the court has not found the remainder of the project to be in noncompliance with [CEQA]." (§ 21168.9, subd. (b).)

## 2. *Principles Governing Severance*

The statute directs courts to consider whether "the portion or specific project activity or activities are severable" (§ 21168.9, subd. (b)), but does not set forth a test for severability. Consequently, we turn to the analysis of severability adopted by our Supreme Court.

The first step of that analysis is to look for any severability clauses in the enactment. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270 (*Matosantos*).) ARB included severability clauses in the ADF regulations and the 2015 LCFS regulations. (Cal. Code of Regs., tit. 13, § 2293.9 [ADF regulations]; *Id.*, tit. 17, § 95497 [2015 LCFS regulations].) These clauses establish a presumption in favor of severance, but are not conclusive. (*Matosantos*, *supra*, at p. 270; *Verner, Hilby and Dunn v. City of Monte Sereno* (1966) 245 Cal.App.2d 29, 35 [invalid licensing requirements in ordinance materially affected remainder of regulatory scheme; entire ordinance held void despite severability clause].)

Determining whether the presumption holds or is negated involves an evaluation of the three judicially prescribed "criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable." (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821.) Grammatical (i.e., mechanical) separability exist when the invalid parts can be removed as a whole without affecting the wording or coherence of the remaining parts. (*Matosantos*, *supra*, 53 Cal.4th at p. 271.) Functional separability addresses how the enactment would operate without the invalid provision and is present when severance does not destroy the regulatory scheme or the utility of the remainder. (*Calfarm*, *supra*, at p. 822; *Blumenthal v. Board of Medical Examiners* (1962) 57 Cal.2d 228, 238.) In other words, functional separability depends on whether the remainder of the enactment is complete in itself and can be implemented without the continuation of the invalid provision. (*Matosantos*, *supra*, at p. 271.) Volitional

separability exists when the legislative body would have adopted the remainder had it foreseen the partial invalidation of the enactment. (*Ibid.*)

### 3. The ADF Regulations Will Remain in Effect

The parties agree that the ADF regulations and the 2015 LCFS regulations can be severed from one another. Our own analysis leads us to conclude that the ADF regulations meet the all the requirements for severance set forth in section 21168.9, subdivision (b). Based on that analysis (which confirms the position taken by the parties), we need not discuss the severability of the ADF regulations in detail. Furthermore, our conclusion that the ADF regulations were not tainted by the continuing CEQA violation leads us to conclude that the ADF regulations shall remain in effect on remand. Accordingly, the relief granted in this appeal will allow the ADF regulations to continue to operate while ARB attempts to address NOx emissions from biodiesel in a way that complies the writ and CEQA.

### 4. Severability of Portions of the LCFS Regulations

Next, we consider whether severing and suspending only a part of the 2015 LCFS regulations is permissible under section 21168.9, subdivision (b). There are many ways to divide the provisions of the 2015 LCFS regulations. For instance, as the CEQA violation concerns only NOx emissions from biodiesel, severance and suspension might be limited to (1) the provisions relating to biodiesel; (2) the provisions addressing all substitutes for conventional diesel, which substitutes include biodiesel and renewable diesel; or (3) the provisions addressing all types of diesel fuel, conventional or otherwise.

As to the first possibility, plaintiffs and ARB both suggest in their supplemental letter briefs that the biodiesel provisions in the LCFS regulations could be severed from the remainder of the LCFS regulations. They contend that severing and suspending the biodiesel provisions would increase the price of credits, which would have the beneficial impact of stimulating the production of fuels with lower carbon intensity values.

49.

Despite the agreement of the parties, we reject a severance of the biodiesel provisions from the remainder of the LCFS regulations. Such a severance would place a disproportionate share of the financial burden of the increase in credit costs on the reporting entities that relied most heavily on biodiesel to bring down the average carbon intensity of the fuels they handled. This shift in the way the costs of the LCFS regulation are borne leads us to conclude the provisions relating to biodiesel are not functionally separable from the remainder of the regulation. The shift in costs would materially affect the operation of the regulatory scheme as to diesel such that the diesel portion of the scheme could no longer be regarded as functioning like the original scheme. (*Matosantos*, *supra*, 53 Cal.4th at p. 271.) In other words, the scheme as to diesel fuel and its substitutes would no longer be complete in itself.

The provisions involving biodiesel are intertwined with the provisions regulating the entire category of diesel fuels. For instance, the compliance schedule (stated in terms of average carbon intensity) addresses "Diesel Fuel and Fuels used as a Substitute for Diesel Fuel" as a single category for the years 2011 to 2020. (Cal. Code of Regs., tit. 17, § 95484, subd. (c).) As result, severing the biodiesel provisions would alter how reporting entities (i.e., fuel blenders, producers, importers and providers) meet the compliance schedule and that alteration would significantly change how the regulatory scheme functions as to diesel. In particular, reporting entities that had relied on biodiesel to reduce the carbon content of their conventional diesel fuel would have to rely on alternate strategies, such as buying and retiring carbon intensity credits or replacing the biodiesel with renewable diesel. As noted by ARB, California already uses more than its proportionate share of the nation's renewable diesel and that share would have to increase if reporting entities substituted renewable diesel for biodiesel to achieve the requisite average carbon content. Thus, invalidating only the biodiesel provisions would disrupt the market for diesel fuel substitutes by making biodiesel less valuable while making renewable diesel and credits more expensive.

50.

As to the second possibility, broadening the severance and suspension to include the provisions relating to all substitutes for conventional diesel would not solve the foregoing problem. Under a scenario where neither biodiesel nor renewable diesel could be reported to reduce the average carbon content of the conventional diesel fuel handled by a reporting entity, the entity would have even more difficultly in meeting the compliance schedule. Therefore, we conclude neither the provisions relating solely to biodiesel nor the provisions relating to all substitutes for conventional diesel should be severed from the remainder of the 2015 LCFS regulations.

The third possibility involves severing the provisions relating to conventional diesel fuel and all its substitutes from the remainder of the 2015 LCFS regulations. This possibility, unlike the two possibilities previously discussed, was explicitly discussed by ARB as one of three possible alternatives to the project addressed in the final Environmental Analysis. That alternative project "would remove the diesel standard from the proposed LCFS regulation" and would address only gasoline and gasoline substitutes. ARB's consideration of this alternative demonstrates that it is feasible to sever the diesel provisions from the remaining provisions of the LCFS regulations. (Guidelines, §§ 15126.6, subd. (a), 15364 [definition of feasible].) This gasoline-only alternative was not rejected on the ground it would destroy the regulatory scheme or its utility. Instead, it was rejected because ARB determined greenhouse gas emissions could be more effectively reduced by including diesel in the regulation. The test for functional separability does not consider if the entire regulation is more effective, it considers whether the remainder is complete in itself and retains its utility. Here, the LCFS regulations would retain some utility if the diesel provisions were excluded because the gasoline provisions would continue to operate and reduce greenhouse gases. Furthermore, this type of severance would not place the financial burden of ARB's failure to comply with the writ on those reporting entities who handled diesel and previously relied on biodiesel to lower their average carbon intensity.

51.

Severing the provisions of the LCFS regulations relating to all diesel fuels also meets the two other criteria in section 21168.9, subdivision (b). The provisions of the LCFS regulations addressing gasoline are in compliance with CEQA because the CEQA violation involving the analysis of NOx emissions from biodiesel did not affect the provisions addressing gasoline. (§ 21168.9, subd. (b).) Also, the record and arguments presented do not show that severing the provisions of the LCFS regulations relating to gasoline and allowing those provisions to remain in effect would prejudice ARB's complete and full compliance with CEQA in connection with NOx emissions from biodiesel. (*Ibid.*)

Therefore, we conclude that the portion of the LCFS regulations that address fuels other than diesel fuel and its substitutes involve project activities that do not need to be suspended for ARB to achieve compliance with CEQA on remand. The possibility of severing and suspending the portion of the LCFS regulations addressing diesel fuel and its substitutes leads us to the more specific question of whether suspension of those provisions is an appropriate remedy in this appeal.

> 5. *Suspending the Diesel Portions of the LCFS Regulations*

In *Poet I*, the CEQA violations relating to the decision maker tainted the approval of the entire project and, thus, we did not consider suspending only a portion of the regulations. Instead, we considered whether to suspend the LCFS regulations in their entirety, which was a remedy within the discretionary authority granted by section 21168.9. (*Poet I*, *supra*, 218 Cal.App.4th at p. 761.) We stated that the potential suspension of the LCFS regulations was "the most controversial issue regarding judicial relief presented in this appeal." (*Ibid.*) We identified two CEQA provisions addressing whether suspension is appropriate:

> "First, suspension requires a finding 'that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project ….' (§ 21168.9, subd.

52.

(a)(2).) Second, the suspension appears to be limited to project activity 'that could result in an adverse change or alteration to the physical environment ….' (§ 21168.9, subd. (a)(2).)" (*Poet I*, *supra*, 218 Cal.App.4th at p. 761.)

We applied these two provisions to the record and arguments presented in *Poet I* and reached the unusual conclusion of allowing the LCFS regulations to remain in operation while ARB undertook its corrective action. (*Poet I*, *supra*, 218 Cal.App.4th at pp. 762-763.) These same statutory provisions must be considered here in analyzing whether to suspend the portion of the LCFS regulations addressing diesel fuel and its substitutes.

Our first inquiry addresses whether allowing the portion of the LCFS regulations addressing diesel fuel and its substitutes to remain in effect would "prejudice the consideration or implementation of particular mitigation measures or alternatives to the project." (§ 21168.9, subd. (a)(2).) In *Poet I*, we concluded that leaving the written standards in the original LCFS regulations in place instead of suspending them would not affect ARB's consideration of mitigations measures and alternatives. (*Poet I*, *supra*, 218 Cal.App.4th at p. 762.) Plaintiffs argue we should not reach the same conclusion here because they have "demonstrated that, so long as the LCFS regulation remains in place, [ARB] will cut analytical corners, and refuse to consider alternatives and mitigation—all to the detriment of communities affected by criteria pollutants such as NOx—simply to defend the continuing existence of the LCFS program." Plaintiffs refer to ARB's analysis of alternatives after the issuance of the February 2014 writ, noting that ARB considered only a "no project" alternative and various iterations of the LCFS regulation and declined to consider feasible alternatives presented by the public.

Plaintiffs' arguments about bureaucratic momentum are realistic and have some merit. However, those arguments must be placed in the context of this case, which involves CEQA violations on a narrow topic (i.e., NOx emissions from biodiesel) and not CEQA violations that taint the entire project. Furthermore, any lack of discussion about

alternatives geared to biodiesel makes sense because alternatives are considered only after a significant environmental effect has been identified. (See Guidelines, § 15126.6 [consideration of alternatives].) Here, ARB's flawed analysis of biodiesel ended before it decided (1) how much, if any, increase in biodiesel use was attributable to the LCFS regulations and (2) whether the NOx emissions associated with that increase in biodiesel use, if any, constituted a significant environmental effect. Consequently, any previous lack of discussion of alternatives to the biodiesel provisions was understandable, considering the order in which CEQA issues are addressed. Therefore, we conclude ARB's recalcitrance on other matters does not show it is unwilling to consider alternatives to the biodiesel provisions, in the event those provisions are found to cause a significant environmental impact.

Next, we consider the question of prejudice from the point of view of what would happen if the LCFS regulations addressing diesel fuel and its substitutes were suspended. Specifically, would "suspending the operation of [that portion] of the LCFS regulations … open for consideration mitigation measures and alternatives that would have been infeasible without the suspension"? (*Poet I*, *supra*, 218 Cal.App.4th at p. 762.) Here, we are not able to identify alternatives or mitigation measures that are infeasible without suspension and become feasible with the suspension of the operation of the provisions in the LCFS regulations addressing diesel fuel and its substitutes. Consequently, we cannot affirmatively find "that a specific project activity or activities will prejudice the consideration or implementation of *particular* mitigation measures or alternatives to the project." (§ 21168.9, subd. (a)(2), italics added.)

Our second inquiry under subdivision (a)(2) of section 21168.9 relates to whether suspension of the portion of the LCFS regulations addressing diesel fuel and its substitutes is warranted because that portion of the project activity "could result in an *adverse* change or alteration to the physical environment." (Italics added.) This inquiry includes distinct questions of fact. First, could the provisions in the LCFS regulations

54.

addressing diesel fuel cause an increase in biodiesel usage in California? Second, could any increase in biodiesel use attributable to the LCFS standards cause an increase in NOx emissions? Third, if increased NOx emissions have or will be caused, is the adverse change to the physical environment attributable to that increase outweighed by the reduction in other pollutants caused by leaving the portion of the LCFS regulations addressing diesel fuel and its substitutes in place? (See *Poet I*, *supra*, 218 Cal.App.4th at p. 762; see fn. 6, *ante* [baby-with-the-bathwater problem].)

The levels of certainty required to resolve these factual questions is addressed by the statutory phrase "could result." (§ 21168.9, subd. (a)(2).) In this context, "could" refers to future events. Consequently, "could" was not used as the past tense of "can," which refers to past ability. (*Quinones v. Pin* (2009) 298 S.W.3d 806, 816.) In reference to future events, "could" is used to indicate possibility, meaning essentially the same thing as "might." (*Ibid.*; *Dorrin v. Union Electric Co.* (1979) 581 S.W.2d 852, 859 ["could" denotes mere capability and often is used as meaning "might"].) In this context, the most likely interpretation of the ambiguous phrase "could result" is that it denotes the level of certainty contained in the fair argument standard. Thus, suspension of a project activity pending compliance with CEQA may be an appropriate remedy when there is a fair argument that the project activity might result in an adverse environmental impact. Conversely, suspension of a project activity is not appropriate when the possibility of an adverse environmental impact resulting from that activity falls below the fair argument standard.

The parties dispute whether the LCFS regulations are and will be a cause in fact of increased usage of biodiesel. The final Environmental Analysis does not include a definitive finding. It states that, given the federal fuel regulations, the federal tax incentives, and other factors, "it is certainly possible that biodiesel use in California would continue at or near existing levels—or even increase—in the absence of the LCFS regulation." Plaintiffs refer to the statement in the final Environmental Analysis that

biodiesel "has been incentivized under the existing LCFS Regulation beginning in 2009." (Underlining omitted.)[19] The foregoing statements leaves open the possibility that some of the increase in California's use of biodiesel may be caused by the provisions of the LCFS regulations that address diesel fuels and its substitutes. Accordingly, we conclude those provisions "could result in" increased usage of biodiesel in the future. (§ 21168.9, subd. (a)(2).)

If the provisions of the LCFS regulations that address diesel fuels and its substitutes increase biodiesel usage, could that increased usage cause an increase in NOx emissions? We conclude that it could because using biodiesel results in more NOx emissions than using replacement fuels. Specifically, conventional diesel and renewable diesel result in lower NOx emissions. Therefore, if the diesel provisions in the LCFS regulations "could result in" an increase in biodiesel use, they also "could result in" an increase in NOx emissions. (§ 21168.9, subd. (a)(2).)

Our inquiry into whether suspension of the diesel provisions in the LCFS regulations "could result in an adverse change or alteration to the physical environment" (§ 21168.9, subd. (a)(2)) leads us to conclude that the provisions "could result in an adverse change" due to increased NOx emissions. This conclusion lends support to suspending the diesel provisions of the LCFS regulations pending ARB's compliance with CEQA. However, such an exercise of our discretionary authority involves further considerations—particularly, the overall environmental impact of suspension and plaintiffs' argument that ARB did not act in good faith.

Considerations of the overall environmental impact prevented this court from suspending the entire LCFS regulations to remedy the CEQA violations found in *Poet I*. (*Poet I*, *supra*, 218 Cal.App.4th at pp. 762-763.) We stated that the LCFS regulations

---

**19** Referring to the creation of incentives does not equate to finding those incentives actually changed the behavior of reporting entities.

"impact on a wide range of air pollutants is not easily quantified" and that "the emissions of greenhouse gases will be less if the LCFS regulations are allowed to remain in effect." (*Id*. at p. 762.) The situation is the same in this appeal. The impact of the diesel provisions in the LCFS regulations is difficult to quantify, but suspending all of those provisions *might* reduce the NOx emissions from biodiesel while increasing the emissions of greenhouse gases. In other words, leaving the category of diesel fuel and its substitutes unregulated by the LCFS regulations would mean reporting entities would not need to lower the average carbon content of those fuels. As a result, we conclude that suspending the diesel provisions of the LCFS regulations would result in adverse environmental impacts due to the increased emissions of greenhouse gases. Weighing this actual increase against a potential reduction in NOx emissions favors not suspending the diesel provisions of the LCFS regulations.

### 6. *Suspension and the Lack of Good Faith*

The last factor we consider in exercising our discretionary authority to fashion a remedy in this appeal is plaintiffs' claim that ARB failed to act in good faith in addressing NOx emissions from biodiesel. Paragraph 11 of the February 2014 writ stated "ARB shall proceed in good faith and without delay" and a failure to proceed would cause the trial court to immediately suspend the operation of the LCFS regulations and vacate the part of the writ that preserved the status quo. Plaintiffs contend the language in paragraph 11 should influence the remedy adopted in this appeal.

Initially, we define what the term "good faith" meant. "In ordinary usage, the phrase 'good faith' is commonly understood as referring to a subjective state of mind." (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1120.) A subjective good faith standard is satisfied by a state of mind denoting honesty of purpose and freedom from intention to mislead or defraud. (*Ibid*.; *Madera Oversight Coalition, Inc. v. County of Madera, supra,* 199 Cal.App.4th at p. 103, fn. 32; see *People v. Accredited Surety*

57.

*Casualty Company* (2014) 230 Cal.App.4th 548, 560, fn. 9 [defining subjective good faith].)  This court used the term "good faith" in the disposition of *Poet I* with the expectation that the parties and trial court would adopt the common understanding and treat the term as imposing a subjective standard.

Next, we apply the subjective good faith standard to the facts presented and consider whether ARB's remedial action was taken without honesty of purpose or sincerity of intentions.  ARB's remedial action was multifaceted and some of that action complied with February 2014 writ and cured the corresponding CEQA and APA violations.  Only ARB's evaluation of NOx emissions from biodiesel failed to comply.  Therefore, plaintiffs' claim that ARB did not act in good faith is limited to ARB's evaluation of NOx emissions from biodiesel.

When ARB addressed NOx emissions from biodiesel pursuant to paragraph 3, ARB misconstrued the term "project" and wrongly determined the original LCFS regulations were not part of the "project."  ARB's erroneous view of the "project" also provided its justification for choosing the wrong baseline.  At the end of part I.E.6, *ante*, we concluded that an objectively reasonable attorney familiar with CEQA, the Guidelines, published CEQA decisions discussing the term "project," and the CEQA violation to be remedied would have interpreted paragraph 3's use of the term "project" to include the original LCFS regulations, the 2015 LCFS regulations, and the ADF regulations.  In other words, ARB's misinterpretation of the term "project" was not objectively reasonable.  Furthermore, ARB's actions do not appear to be a sincere attempt to provide the public and decision makers with the information required by CEQA.  Rather, it appears as though ARB was attempting to avoid its disclosure and fact finding responsibilities because, among other things, its incorrect interpretation of "project" allowed it to skip over the adverse consequences that might have accrued while the original LCFS regulations were in effect.  Therefore, we conclude most of ARB's corrective action in response to the February 2014 writ satisfied a subjective good faith

standard, but infer the part of ARB's corrective action addressing NOx emissions from biodiesel did not.

At oral argument, ARB's counsel argued ARB acted in good faith, maintaining that under *Friends of the College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, project definitions are left to the agency's discretion and are based largely on whether the definition adopted allows accurate information to be disclosed to the public. This argument further illustrates ARB's willingness to ignore the weight of authority to grasp the slenderest of reeds to justify misreading the writ. (Cf. fn. 17, *ante*.) Of the many reasons why ARB's reliance on *San Mateo Gardens* is misplaced, we mention only two. First, *San Mateo Gardens* addressed whether section 21166's requirement for a subsequent or supplemental EIR applied to the facts presented. (*San Mateo Gardens*, *supra*, at pp. 943-944.) In contrast, this appeal does not involve section 21166 or a determination by ARB whether a supplemental EIR is required. Second, the Supreme Court did not overturn, explicitly or by implication, this court's conclusion that the question of which acts make up the whole of the action constituting the CEQA project is a question of law (i.e., is not a discretionary determination) resolved without deference to the agency's determination. (*Tuolumne CCRG*, *supra*, 155 Cal.App.4th at p. 1224.)

Having decided ARB did not act in good faith, we address the role ARB's lack of good faith should have in determining the appropriate relief in this appeal. The agency's good faith is not a factor identified in section 21168.9, but we consider it relevant to the exercise of our discretionary authority to fashion appropriate appellate relief in this case.[20] Nonetheless, the tail should not wag the dog and the goals of CEQA should not

---

[20] Also, our disposition in *Poet I* directed ARB to proceed in good faith without delay in taking its corrective action and stated a failure to proceed in good faith would result in vacating the provisions in paragraph 6 of the writ that preserved the status quo and suspending the operation of the original LCFS regulations. (*Poet I*, *supra*, 218 Cal.App.4th at p. 767; see pt. II.C.2, *ante*.) Thus, we considered ARB's good faith as a

be compromised to punish agency bad faith. In other words, the relief granted in this appeal should serve the public interest by protecting the environment and providing information to the public and decision makers. Conversely, the relief granted should not harm the environment in order to punish an agency. The only way to justify such relief would be if the benefits derived from deterring future agency misconduct clearly outweighed the adverse environmental effects of that relief. Here, the possible deterrence benefit does not meet this test.

Based on our consideration of all the factors relevant to suspending project activity—including the limited scope of ARB's lack of good faith in taking corrective action—we conclude that the provisions in the LCFS regulations addressing diesel fuel and its substitutes, though severable, should not be suspended while ARB makes another attempt at analyzing NOx emissions from biodiesel in a manner that complies with CEQA and the writ.

### 7. *Maintaining the Status Quo*

The final question about the relief granted in this appeal relates to whether we should include a provision preserving the status quo pending ARB's compliance with the writ and CEQA. Freezing the standards contained throughout the 2015 LCFS regulations is not appropriate because the ongoing CEQA violation involves only NOx emissions from biodiesel. Therefore, the status quo provisions in paragraph 6 of the February 2014 writ will be modified.

Any preservation of the status quo should be limited to the provisions (1) tainted by the CEQA violation and (2) severable from the remainder of the LCFS regulations. Those provisions of the LCFS regulations govern diesel fuel and its substitutes. (See pt. II.F.5, *ante*.) Freezing these standards would create an incentive for ARB to complete the

---

factor affecting the remedy imposed in *Poet I* and we continue to adhere to that general principle in this appeal.

required environmental disclosures and make the findings about NOx emissions and, if required, mitigation measures and alternatives. The provisions addressing gasoline, natural gas and other transportation fuels would not be affected because they are not affected by an ongoing CEQA violation.

On balance, we conclude it would be appropriate to freeze the standard for the severable portion of the regulations—specifically, the standards applicable to diesel fuel and its substitutes. Accordingly, the 2017 standards applicable to diesel fuel and its substitutes shall remain the operative standards until ARB has obtained a discharge of the writ from the trial court.

G.    Guidance as to the Baseline on Remand

ARB has requested, in effect, that we endorse its use of a 2010 baseline on remand. ARB's theory for use of a 2010 baseline is grounded on the fact that 2010 was a reporting year[21] only and the carbon intensity requirements in the original LCFS regulations did not take effect until January 1, 2011. Thus, ARB reasons that the project could not have caused any changes in biodiesel use during 2010.

Approving the use a 2010 baseline is inappropriate for a number of reasons, three of which we discuss here. First, Guidelines section 15125, subdivision (a) normally requires the use of an existing conditions baseline, which means the conditions "as they exist … at the time environmental analysis is commenced." The ISOR published on March 5, 2009, contained an environmental disclosure document, which demonstrates that the environmental analysis conducted by ARB commenced before that date. It follows that a 2010 baseline would not be an existing conditions baseline for purposes of

---

[21]    Under the original LCFS regulations, only the reporting, recordkeeping and auditing provisions applied during 2010, while the carbon intensity and other requirements started applying January 1, 2011. (Cal. Code of Regs., tit. 17, former § 95480.1, subd. (a).)

61.

Guidelines section 15125, subdivision (a).  Consequently, if ARB wishes to use a 2010 baseline on remand, it must justify that departure from the norm and support that justification with substantial evidence.  (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 448 [departure justified "when necessary to prevent misinforming or misleading the public and decision makers"].)

Second, ARB's argument is oblivious to the possibility that reporting entities began adapting to the new regulation (i.e., modifying their behavior) prior to the effective date of the carbon intensity requirements contained in the original LCFS regulations.  ARB previously recognized this possibility in its final Environmental Analysis, which stated that biodiesel "has been incentivized under the existing LCFS Regulation *beginning in 2009*."  (Underlining omitted, italics added.)  At a minimum, this statement suggests that reporting entities began modifying their behavior by increasing production and imports of biodiesel in 2009, effectively gearing up for the carbon intensity requirements that would be applied at a later date.  Whether or not reporting entities did, and whether the volume of biodiesel used in 2009 or 2010 increased because of the consideration or adoption of the original LCFS regulations present questions of fact that must be decided by the agency in the first instance.[22]

Third, the issue of whether using NOx emissions in 2010 would comply with CEQA is not properly before this court because the hypothetical use of a 2010 baseline on remand is not one of the "grounds for noncompliance" which CEQA alleged in this appeal.  (See § 21005, subd. (c).)  Here, a ground for noncompliance was ARB's use of a 2014 baseline.  Furthermore, the issue is not an "actual controversy" for purposes of

---

[22]  ARB's failure to recognize the factual issues underlying the choice of a NOx baseline means it has cited no evidence tending to prove biodiesel producers only reacted to the original LCFS regulations and began producing more biodiesel after the carbon intensity requirements kicked in at the start of 2011.  ARB's failure to recognize the underlying factual issues also indicates a misunderstanding of, or an unwillingness to apply, the limits CEQA and the Guidelines place on its selection of a baseline.

62.

Code of Civil Procedure section 1060 and any conclusions reached by us would be merely an advisory opinion. (See *Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 542 [court declined to issue an advisory opinion on a controversy that did not yet exist].)

Accordingly, we will not decide whether a 2010 baseline is appropriate for use on remand. Furthermore, we limit our informal guidance on the choice of baseline to the following observations. First, ARB should determine when it commenced its environmental analysis of the original LCFS regulations. Second, if ARB chooses to adopt a baseline other than the normal, existing conditions baseline, it must provide an adequate justification for that choice and support that justification with substantial evidence. For instance, a conclusory statement that an existing conditions baseline would be misleading is not an adequate justification. Third, the choice of an existing conditions baseline would avoid challenges to that choice based on the argument that baseline chosen includes increases in biodiesel use because reporting entities already had begun modifying their behavior in anticipation of the adoption or implementation of the original LCFS regulations.

## DISPOSITION

The order discharging the peremptory writ of mandate is reversed. The superior court is directed to vacate that order and enter a new order (1) stating the Air Resources Board's return did not demonstrate compliance with paragraph 3 the peremptory writ of mandate and (2) denying the Air Resources Board's request for an order discharging the writ.

The superior court shall issue further orders to compel the Air Resources Board's obedience to the writ and CEQA, including modifying the writ to compel the Air Resources Board to take the following action:

(1) Set aside its 2015 approval of the parts of the final Environmental Analysis addressing NOx emissions from biodiesel.

63.

(2) Address whether the project as a whole "is likely to have"[23] caused an increase in NOx emissions in the past and is likely to cause an increase in NOx emissions in the future. The baseline used for analyzing each period's NOx emissions shall reflect the conditions existing at the time the environmental analysis of the original LCFS regulations was commenced, unless Air Resources Board provides sufficient justification, supported by substantial evidence, for use of a later baseline. In no event shall the baseline conditions describe a year later than 2010. The discussion in the environmental disclosure document shall comply with CEQA, including without limitation an analysis and findings addressing whether the project as a whole is likely to have caused an increase in NOx emissions in the past and whether the project as a whole is likely to cause increases in NOx emissions in the future. After identifying the increased NOx emissions attributable to the project as a whole on a year-by-year basis, the disclosure document shall address whether the increased emissions had, or are likely to have, a significant adverse effect on the environment or are cumulatively considerable. Findings on the foregoing matters shall be supported by substantial evidence. Findings as to the causes for future biodiesel use shall take into account that the incentives provided by federal regulations have or will change over time (e.g., the expiration of the excise tax credits). If required by CEQA, the disclosure document shall address mitigation measures and alternatives to the provisions in the regulations addressing diesel fuel and its substitutes.

(3) Preserve the status quo relating to conventional diesel fuel and its substitutes by continuing to adhere to the standards in effect during 2017 for those fuels until the corrective action is complete and approved by the trial court in an order discharging the writ.[24]

---

[23]    The phrase "is likely to have" appears in section 21061.

[24]    This provision replaces paragraph 6 of the February 2014 writ.

(4) Proceed in the manner required by CEQA when resolving procedural issues, such as whether the revised environmental disclosure documents are released for public review and comments.

The statements that follow are intended to aid in the interpretation and application of the foregoing modifications. First, the modifications to the writ shall not affect the validity and continuing operation of the ADF regulations. Second, there shall be no striking of text from the LCFS regulations; rather, the freeze of the standards for conventional diesel and its substitutes shall operate in the manner of an injunction rather than voiding or invalidating provisions that would have come into effect in 2018 and later. Third, Air Resources Board need not suspend its consideration or approval of additional fuel pathways for diesel fuel and its substitutes.[25]

The superior court shall continue to retain jurisdiction over the proceedings by way of a return to the writ. The superior court may, in an exercise of its discretion, require the Air Resources Board to file an initial return after issuing the order modifying the February 2014 writ. The superior court's jurisdiction shall include the authority to hear a motion for clarification of the terms of the modified writ if the parties dispute its proper interpretation or application. The superior court may hear such a motion on an expedited basis and its decision may be subject to writ review by this court. Interpretation of this disposition and the writ shall be in accordance with CEQA's requirements, principles and polices.

The superior court shall require the Air Resources Board to proceed diligently, reasonably and in subjective good faith while implementing corrective action pursuant to the modified writ and filing a final return. If the Air Resources Board fails to proceed in this manner, the superior court immediately shall vacate the portion of the writ that

---

[25]    This statement is inherent in previous statements, but we include a redundancy because the parties raised the fate of new pathways during oral argument.

preserves the status quo with respect to the standards applicable to diesel fuel and its substitutes and shall direct the Air Resources Board to set aside the provisions of the LCFS regulations applicable to diesel fuel and its substitutes (i.e., suspend the operation and enforcement of those provisions) and, in its discretion, may impose other sanctions. If the Air Resources Board's corrective action requires a notice of approval of regulatory action from the Office of Administrative Law, the Air Resources Board may file its final return before obtaining that notice; if it chooses to wait for the approval, it shall demonstrate the necessity for that delay in its final return.

Nothing in this disposition or the writ shall prevent the Air Resources Board from taking action addressing issues currently raised in other litigation when it takes the corrective action required by this writ.[26] Plaintiffs shall recover their costs on appeal.

_____

FRANSON, J.

WE CONCUR:

_____

KANE, Acting P.J.

_____

SMITH, J.

_____

[26]    For instance, Air Resources Board might chose to exercise its discretion and provide an additional analysis of "reasonably foreseeable indirect physical changes to the environment" (Guidelines, § 15378, subd. (a)) that may have been caused by the project, such as the impacts of fuel shuffling alleged by plaintiffs. The reasonably foreseeable changes resulting from alterations in the behavior of third parties subject to a new law was discussed in detail by this court in *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, at pages 1582 through 1598. That case discussed the reasonably foreseeable indirect physical changes, both inside and outside the county, resulting from the reaction of third parties to the requirements of a new ordinance addressing sewage sludge disposal.